No. 2--10--0131

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE CITY OF CHICAGO, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff and Defendant-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 07--ED--59 |
| | ) | 09--CH--4483 |
| ST. JOHN'S UNITED CHURCH OF | ) | |
| CHRIST, | ) | |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |
| (Clifford A. Sell, Sr., et al., Intervenors- | ) | Honorable |
| Appellants; Florence Anderson et al., | ) | Hollis L. Webster, |
| Plaintiffs-Appellants). | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the opinion of the court:

These cases arise out of the City of Chicago's condemnation of St. Johannes Cemetery, exercised in the course of expanding O'Hare Airport. In the eminent-domain action, case No. 07--ED--59, defendant, St. John's United Church of Christ, which owned the cemetery, and several hundred relatives of those buried at St. Johannes, sought, via a traverse and motion to dismiss, to prevent the condemnation and destruction of the cemetery. In case No. 09--CH--4483, Florence Anderson and 67 other individuals with religious and property rights in the graves of ancestors buried in the cemetery sought injunctive relief to prevent the condemnation. The cases were consolidated in November 2009. On February 8, 2010, the trial court, having denied or dismissed all challenges

to the condemnation, granted Chicago's motion for immediate vesting of title under section 20--5--5 of the Eminent Domain Act (Act) (735 ILCS 30/20--5--5 (West 2008)). This appeal followed.

FACTS

In July 2002, the City of Chicago (the City) disclosed plans to make changes at O'Hare International Airport, including construction of runways, additions to or relocation of runways, construction of new terminals, and construction of ground transportation facilities, ramps, parking, staging areas, mass transit, clear zones, and other airport-related facilities. The Chicago city council adopted an ordinance determining that the acquisition of certain properties was necessary and desirable for the expansion project and authorizing the exercise of the power of eminent domain to acquire those properties. The City planned to acquire approximately 433 acres of land located in Elk Grove Village and the Village of Bensenville. St. Johannes Cemetery was included in the list of properties to be acquired.

In 2003, the Illinois legislature passed the O'Hare Modernization Act (Modernization Act) (620 ILCS 65/1 et seq. (West 2004)). Section 15 of the Modernization Act provided, among other things:

"In addition to any other powers that the City may have, and notwithstanding any other law to the contrary, the City may acquire *** any right, title, or interest in any private property, property held in the name of or belonging to any public body or unit of government, or any property devoted to a public use, or any other rights or easements, including any property, rights, or easements owned by the State, units of local government, or school districts, including forest preserve districts, for purposes related to the O'Hare Modernization Program. The powers given to the City under this Section include the power to acquire, by

condemnation or otherwise, any property used for cemetery purposes within or outside of the City, and to require that the cemetery be removed to a different location." 620 ILCS 65/15 (West 2004).

The Modernization Act amended various other state acts, including the Religious Freedom Restoration Act (Religious Freedom Act ) (775 ILCS 35/1 et seq.) (West 2004)), to which was added section 30:

"Nothing in this Act limits the authority of the City of Chicago to exercise its powers under the O'Hare Modernization Act for the purposes of relocation of cemeteries or the graves located therein." 775 ILCS 35/30 (West 2004).

Various parties brought suits in various federal courts. St. John's, joined by Helen Runge and Shirley Steele, filed a suit in the United States District Court for the Northern District of Illinois.[1] Among the claims brought by St. John's in its amended complaint were that the City violated its constitutional rights under the free exercise clause of the first amendment to the United States Constitution and the equal protection clause of the fourteenth amendment to the United States Constitution by not demonstrating a compelling governmental interest and use of the least restrictive mechanism, as was ordinarily required by the Religious Freedom Act. It also alleged violations of the takings clause of the fifth amendment and the due process clause of the fourteenth amendment. The federal district court dismissed the first amended complaint for failure to state a claim upon which relief could be granted and denied leave to file a second amended complaint. The Seventh Circuit

---

[1]St. John's also became involved in separate proceedings alleging violations of federal law, begun in the District of Columbia.

Court of Appeals affirmed. See St. John's United Church of Christ v. City of Chicago, 502 F.3d 616 (7th Cir. 2007).

On October 16, 2007, the City filed complaints for condemnation against various properties, including St. Johannes cemetery, in case No. 07--ED--59. St. John's filed a traverse and motion to dismiss on February 1, 2008, alleging, among other things, that the taking of St. Johannes was unnecessary for the planned expansion of O'Hare and that it would violate the guarantee of free exercise of religion contained in the Illinois Constitution (Ill. Const. 1970, art. I §3). On June 2, 2008, the trial court ruled that St. John's claim regarding the free exercise of religion was barred by res judicata. The court also denied St. John's motion to compel additional discovery.

On June 17, 2008, the City moved the court to appoint a guardian ad litem. The City stated that it had filed with the complaint an affidavit alleging that certain additional persons may have an interest in the case; however, the City did not know the identity of these persons. The City had published a notice of the filing of the condemnation suit once a week for three weeks in the Daily Herald newspaper and had also filed a lis pendens notice with the recorder of deeds. No person filed an appearance or contacted the City in response. The City identified persons potentially having an interest in the case as "pre-need owners" (persons who have purchased rights of interment on a pre-need basis), living relatives of the deceased buried in St. Johannes, those interred in St. Johannes who have no living relative, and the interred for whom no living relative has been identified. The City argued that courts often appoint a guardian ad litem "to represent the interests of persons who are necessary parties, but who are unknown or unable to represent themselves."

On August 11, 2008, seven living relatives of persons buried in St. Johannes filed a petition to intervene, pursuant to section 10--5--75 of the Act (735 ILCS 30/10--5--75 (West 2008)), and a

traverse, alleging that the condemnation would violate their right to the free exercise of religion guaranteed in the Illinois Constitution and that the taking was not necessary. The trial court granted the petition to intervene on October 2, 2008, but ruled that the intervenors were bound by all prior court orders, including the May 29, 2008, order in which the court found that the claim regarding the free exercise of religion was barred under the doctrine of res judicata. When asked if the intervenors were precluded by res judicata from raising the issue, the trial court responded:

"I did not say that, Mr. Karaganis. It's the law of the case. It's the law of the case. It's the ruling that was made by Judge Killander [sic] where I know what the basis was, but the ultimate ruling was what I indicated moments ago.

St. John's claim of violation of the Illinois constitutional guarantee of the free exercise of religion is barred from presentation in this suit; that will go to the presentation of those issues by the intervenors as well. That's the law of this case."

On October 21, 2008, the trial court did not appoint a guardian ad litem but appointed Edward Duncan as a special master "not as a legal representative of living relatives of deceased persons interred at St. Johannes Cemetery--but to advise and assist the Court." The court found that "relatives of deceased persons buried in St. Johannes as well as other third persons who may have certain rights in graves at St. Johannes have a statutory right to intervene in this action." While the City had "attempted" service of process by publication, "[n]o persons served by publication other than the intervenors" had filed an appearance. The court concluded that a "reasonable effort must be made to give actual notice to persons who may have certain rights in the graves or gravesites at St. Johannes so that these persons have an opportunity (should they desire) to intervene and participate in the litigation." The City and St. Johannes were to supply Duncan with information regarding

identity and contact information regarding living relatives by October 31, 2008, and notice was to be sent via certified mail, return receipt requested, by November 21, 2008.

On February 10, 2009, more than 270 living relatives (including Helen Runge, who had been a plaintiff in the federal suit) filed a second amended petition to intervene, pursuant to section 10--5--75 of the Act (735 ILCS 30/10--5--75 (West 2008)), and a traverse and motion to dismiss. This second group of intervenors alleged that the City violated both Illinois and federal guarantees of the free exercise of religion, state and federal prohibitions of the establishment of religion, and the Religious Freedom Act, and they alleged that the taking of St. Johannes was not necessary. These intervenors also sought class certification. On April 20, 2009, the trial court granted leave to intervene. However, the court also found that the new intervenors "shall be bound by prior orders" in the case, including the order of May 29, 2008. While that order was the law of the case, it did not "automatically bind" these intervenors. However, the court noted that Helen Runge was a named plaintiff in the federal case and an intervenor. Thus, "all other Intervenors in this action, and any other persons found to be similarly situated and ultimately a member of a class herein, are privies to Helen Runge and the Church." Any property interest of a living relative was "identical to the property interest of Helen Runge and the Church." In addition, these intervenors' due process right to receive their day in court had been "fully protected by the very adequate representation of Helen Runge and the Church in the federal action." The court found "a substantial pre-existing legal relationship" between these intervenors and the church, as the church had fee simple title in the cemetery while the intervenors had purchased perpetual easements. Thus, the law of the case as to prior rulings in this case applied to these intervenors, and res judicata applied to them through the trial court's rulings against the original parties based on the prior judgment entered in the federal litigation.

These intervenors were precluded from raising state constitutional and statutory claims, and the trial court denied their traverse and motion to dismiss on April 16, 2009.

The trial court subsequently ordered that notice of the proceedings be sent to additional living relatives who had recently been discovered. On September 30, 2009, 68 such living relatives (the injunctive plaintiffs), none of whom had been intervenors in the eminent-domain case, brought an action seeking declaratory and injunctive relief against the City's planned acquisition and destruction of St. Johannes (case No. 09--CH--4483). They alleged violations of state and federal guarantees of the free exercise of religion and state and federal prohibitions against the establishment of religion. They also raised claims regarding due process, breach of contract, equitable estoppel, unconstitutional discretionary decision-making by the City, and abuse of discretion. On November 10, 2009, they filed a motion for a temporary restraining order and/or a preliminary injunction against the taking and destruction of St. Johannes. On the City's motion, the case was consolidated with the eminent-domain action. The trial court then refused to hear the motion for a temporary restraining order and found that the injunctive plaintiffs were bound by the court's prior ruling regarding res judicata.

The trial court denied the original traverses following a hearing held on December 10, 2009. Following a hearing on February 8, 2010, the trial court issued an order vesting title in St. Johannes in the City. This appeal followed.

## RES JUDICATA

The living relatives first contend that the trial court improperly applied res judicata to bar them from raising claims regarding their constitutional religious rights. Under the doctrine of res judicata, a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action. River Park, Inc. v. City of

Highland Park, 184 Ill. 2d 290, 302 (1998). The bar extends to what was actually decided in the first action, along with those matters that could have been decided in that suit. River Park, Inc., 184 Ill. 2d at 302. The policy behind res judicata is to promote judicial economy by preventing repetitive litigation. Doe v. Gleicher, 393 Ill. App. 3d 31, 39 (2009). Three requirements must be satisfied for the doctrine of res judicata to apply: (1) there was a final judgment on the merits, rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies. River Park, Inc., 184 Ill. 2d at 302. As res judicata involves a question of law, we give this issue de novo review. See Arvia v. Madigan, 209 Ill. 2d 520, 526 (2004).

Clearly, a final judgment on the merits was entered in the federal litigation. The dismissal of a complaint for failure to state a claim is an adjudication on the merits. See Nowak v. St. Rita High School, 197 Ill. 2d 381, 390 (2001). Here, the federal district court dismissed St. John's first amended complaint for failure to state a claim upon which relief could be granted and denied leave to file a second amended complaint. The circuit court of appeals affirmed. The St. John's claims were adjudicated on the merits in federal court.

To determine whether an identity of cause of action exists such that res judicata applies, Illinois courts apply the transactional analysis. River Park, Inc., 184 Ill. 2d at 310-11. Under this test, we must look to the facts that give rise to the plaintiffs' right to relief. River Park, Inc., 184 Ill. 2d at 309-10. Separate claims are considered the same cause of action for res judicata purposes if they arise from a single group of operative facts, regardless of whether they assert different theories of relief. River Park, Inc., 184 Ill. 2d at 311. Here, all claims, both federal and state, clearly arose from a single group of operative facts: the City's condemnation of St. Johannes cemetery as part of the O'Hare expansion plan. Although the state constitutional claims were not raised in the federal

case, they could have been. See <u>River Park, Inc.</u>, 184 Ill. 2d at 317 ("we cannot say in this case that the district court would have lacked jurisdiction over plaintiffs' state law claims [that defendant abused its power under the Illinois Constitution]. Federal courts are entitled to exercise supplemental jurisdiction over claims that are part of the 'same case or controversy' as a claim over which they have original jurisdiction. [Citation]"). Clearly, the transactional analysis reveals an identity of cause of action for <u>res judicata</u> purposes.

The third requirement of <u>res judicata</u> is an identity of parties or their privies. See <u>River Park, Inc.</u>, 184 Ill. 2d at 302. Regarding identity of parties, clearly St. John's and Helen Runge are identical parties and, because there was a ruling on the merits and an identity of cause of action, they and their privies are subject to the strictures of <u>res judicata</u>. However, the question remains whether the living relatives are privies of St. John's or Runge such that they should be subject to the limits imposed under <u>res judicata</u>.

The term "privity" is not precise, and there is no generally prevailing definition that can automatically be applied in all cases. <u>City of Rockford v. Unit Six of the Policemen's Benevolent & Protective Ass'n</u>, 362 Ill. App. 3d 556, 563 (2005). "Privity expresses 'the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties.' " <u>Purmal v. Robert N. Wadington & Associates</u>, 354 Ill. App. 3d 715, 722-23 (2004), quoting Restatement of Judgments §83, Comment <u>a</u>, at 389 (1942). Under Illinois law, privity is said to exist when parties adequately represent the same legal interests. <u>People ex rel. Burris v. Progressive Land Developers, Inc.</u>, 151 Ill. 2d 285, 296 (1992); <u>City of Rockford</u>, 362 Ill. App. 3d at 563. In addition, privity exists between parties who share a mutual or successive relationship

in property rights that were the subject of an earlier action. <u>Board of Education of Sunset Ridge School District No. 29 v. Village of Northbrook</u>, 295 Ill. App. 3d 909, 919 (1998). A nonparty may be bound pursuant to privity if his interests are so closely aligned to those of a party that the party is the "virtual representative" of the nonparty. <u>City of Rockford</u>, 362 Ill. App. 3d at 563.

The living relatives argue that the United States Supreme Court has disapproved of the doctrine of preclusion by virtual representation. See <u>Taylor v. Sturgell</u>, 553 U.S. 880, ___, 171 L. Ed. 2d 155, 175-76, 128 S. Ct. 2161, 2178 (2008). While this is true, the living relatives neglect to note that, in deciding <u>Taylor</u>, the Court was involved in developing the <u>federal</u> common law of preclusion, not imposing a single uniform rule of <u>res judicata</u>. See <u>Taylor</u>, 553 U.S. at ___, 171 L. Ed. 2d at 167, 128 S. Ct. at 2171. The Court stated that the "established grounds for nonparty preclusion described in this opinion" applied to the "preclusive effects of a judgment in a federal-question case decided by a federal court." <u>Taylor</u>, 553 U.S. at ___, 171 L. Ed. 2d at 175, 128 S. Ct. at 2178; see also <u>State ex rel. Schachter v. Ohio Public Employees Retirement Board</u>, 121 Ohio St. 3d 526, 2009--Ohio--1704, 905 N.E.2d 1210, ¶42. The Court has held that states "are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes." <u>Richards v. Jefferson County</u>, 517 U.S. 793, 797, 135 L. Ed. 2d 76, 83, 116 S. Ct. 1761, 1765 (1996). Indeed, when a federal court sits in judgment of a diversity case, federal law applies the rules of preclusion applied by the state in which the rendering court sits. <u>Taylor</u>, 553 U.S. at ___, 171 L. Ed. 2d at 167, 128 S. Ct. at 2171. Extreme applications of the doctrine of <u>res judicata</u> might be inconsistent with a fundamental federal right. <u>Richards</u>, 517 U.S. at 797, 135 L.

Ed. 2d at 83, 116 S. Ct. at 1765.[2]  However, Taylor in no way addressed, let alone overruled, this state's common law regarding privity.

St. John's was joined in its federal court filing by Helen Runge and Shirley Steele, whom the Seventh Circuit described as "two of its parishioners."  St. John's United Church of Christ, 502 F.3d at 619.  Runge was also one of the more than 270 living relatives who were granted leave to intervene in the eminent-domain case.  Thus, the question is whether the presence of St. John's and/or Runge and Steele as parties in the federal case provides an identity of parties or their privies such that res judicata would apply to the living relatives.

In its traverse and motion to dismiss, St. John's alleged that it was the owner of St. Johannes. St. John's and its congregants shared "a core religious belief" that St. Johannes "is holy and sacred ground," where "the bodies of the deceased Members and relatives are committed to the ground at the conclusion of the Rite of Burial ceremony."  The church community also had a "central religious belief that the graves of those departed and buried in the consecrated ground of St. Johannes must remain inviolate and undisturbed until the Judgment Day when Jesus Christ will raise them up from

---

[2]In Richards, the Alabama Supreme Court had concluded that the class of all nonfederal employees subject to Jefferson County's occupation tax were adequately represented in a prior suit challenging the tax by three county taxpayers, the City of Birmingham, and the city's acting director of finance.  The United States Supreme Court described the petitioners in Richards, who had not received any notice of the prior litigation, and the prior litigants as "mere 'strangers' to one another" and was unable to conclude that the prior plaintiffs "provided representation sufficient to make up for the fact that petitioners neither participated in *** nor had the opportunity to participate in" the prior action.  Richards, 517 U.S. at 802, 135 L. Ed. 2d at 86, 116 S. Ct. at 1768.

the dead." To remove or disturb a body in St. Johannes "would be a desecration of holy ground."

Taking this ground "would substantially burden and injure the religious exercise" of St. John's and its members. The ground is held by St. John's "in sacred trust for God," and seizure by a secular body would be a "sacrilege" and injurious to St. John's religious beliefs.

Each traverse and motion to dismiss filed by the intervenors and the complaint for injunctive relief alleged, almost verbatim, the "core" and "central" religious beliefs alleged by St. John's in its traverse and motion to dismiss. In addition, each alleged that those seeking relief owned rights of easement in St. Johannes that were "associated with the interment therein of numerous *** forbearers and relatives." The property interests include "the right of access to preserve and protect the graves of their deceased relatives from defacement, destruction and despoliation, including the preservation and protection of these sacred graves from injury to the fundamental religious beliefs and religious rights of the [living relatives] and their deceased relatives that these sacred graves remain undisturbed to the Day of Resurrection."

All of the living relatives in this case shared the same core religious beliefs and property interests that they sought to protect by intervening or seeking injunctive relief. They also shared those same core religious beliefs with St. John's. The living relatives' interests are not only closely aligned to those of Runge, they are, in the words of the living relatives' own filings, exactly the same as Runge's. Runge and the other intervenors are no "mere 'strangers' to one another." See Richards, 517 U.S. at 802, 135 L. Ed. 2d at 86, 116 S. Ct. at 1768. As Runge was a party to the federal litigation, and all the intervenors' interests were the same as Runge's, we determine that Runge was an adequate representative of the intervenors such that Runge and the living relatives were privies for purposes of a res judicata analysis. Thus, as we have already found that there was a final judgment

-12-

on the merits rendered by a court of competent jurisdiction and that there was an identity of cause of action, we conclude that the trial court did not err in applying res judicata to all of the living relatives who intervened or sought injunctive relief.

Because we have determined that the trial court did not err in applying res judicata to the living relatives, we need not address the constitutional issues raised by those parties.

DISCOVERY

St. John's and the living relatives (appellants) contend that the trial court erred in denying their motion to compel discovery of additional documents regarding the issues of necessity and discretion. A trial court is granted considerable discretion in ruling on matters pertaining to discovery, and this court will not reverse such a ruling absent an abuse of that discretion. Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd., 392 Ill. App. 3d 1, 11 (2009).

Each of the three traverses filed in this case alleged that the taking and destruction of St. Johannes Cemetery was not necessary for the planned development of O'Hare. Appellants argue that parts of the project that formed the basis for the Modernization Act and the enabling ordinance are no longer being considered by the City and that there is no longer a demonstrable need for the runway lengths and/or configuration that initially required the taking of St. Johannes.

An ordinance containing legislative findings of necessity is prima facie evidence of necessity. See City of Oakbrook Terrace v. La Salle National Bank, 186 Ill. App. 3d 343, 350 (1989). A court's inquiry into the existence of necessity in an eminent domain case is "limited but crucial." People ex rel. Director of Finance v. Young Women's Christian Ass'n, 86 Ill. 2d 219, 233 (1981) (YWCA).

"The general rule is that where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the

necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted. [Citations.] An abuse of such power, however, will not be tolerated, and if no necessity for its exercise exists, or if it appears that the quantity of the property sought to be taken is grossly in excess of the amount necessary for the public use, the court will not permit the land to be taken." City of Chicago v. Vaccarro, 408 Ill. 587, 597 (1951).

A condemnation action can involve at least four issues concerning necessity: (1) whether the declared public use is necessary; (2) whether some property of the general type being condemned is necessary to serve the declared public use; (3) whether the property condemned is necessary as opposed to similar or neighboring properties; and (4) whether it is necessary to acquire the subject property by eminent domain as opposed to voluntary sale or lease. YWCA, 86 Ill. 2d at 233. It is permissible for a condemnor to take not only sufficient land for the present need, but it may, and should, anticipate future increased demands for the public use for which the land is being devoted. Vaccarro, 408 Ill. at 597. "This court is fully committed to this rule." Vaccarro, 408 Ill. at 597.

In denying the motion to compel, the trial court stated that it had reviewed "all of the documents, plans, and public records previously produced by the City in this matter" and found that "St. John's has everything by way of discovery on the issue of necessity the City is required to produce." The court also specifically found that "the possibility of alternate plans, and the City's ability to pay for construction, are not areas of judicial inquiry."

We first note that it is unclear exactly what evidence was turned over to appellants. In their brief, appellants allege that the City had made available "various public documents," yet later they reference "thousands of pages of FAA material submitted by Chicago." Ultimately, appellants seem

to be seeking "discovery of Chicago's internal documents relative to Appellants' constitutional necessity and abuse of discretion claims." They argue that "there are strong indications that Chicago has now abandoned or curtailed major components of the Alternate C (OMP)." Thus, as they argued in their motion to compel:

"The seizure and destruction of St. Johannes by Chicago is not necessary for the limited runway project that Chicago is actually building at O'Hare. There are alternative locations for the runway that Chicago proposes to construct over and through St. Johannes Cemetery-- locations that would not destroy St. Johannes Cemetery."

This argument misses the point. The issue of necessity is not a question of whether it is necessary to use each parcel of land specifically for the exact purpose originally planned, nor is it a question of whether the planned use could be reconfigured such that a particular parcel would no longer be required for the project. These are questions of a technical nature that are not appropriate for judicial review. The issue of necessity relates to whether the airport expansion is a legitimate public necessity.

Judicial interference in the actual plan to be implemented would lead to interminable delays, as there is always a different way to configure the use of land, especially a plan as massive as the expansion of an airport. Even if the overall expansion plan has changed such that the planned runway could be built on land other than the cemetery land, the fact remains that the runway is planned to be built there, and the trial court would have no authority to scuttle the plan or require the City to redraw the plan to place the runway elsewhere. We agree that alternate plans and the City's ability to pay were not relevant issues in the trial court. Therefore, we find no abuse of discretion here.

IMPROPER GRANT OF DISCRETION

Appellants next contend that the City's enabling ordinance improperly delegated decisions as to which projects in the expansion plan were to be built and which parcels of land within the planned expansion area were to be acquired. In its December 17, 2009, opinion and order, the trial court stated that this issue was brought up only in an oral request to amend a traverse, and the court denied it as "untimely and irrelevant." However, we note that count IX of the complaint for injunctive and declaratory relief specifically alleged "UNCONSTITUTIONAL DISCRETIONARY DECISION-MAKING POWER IN THE EXECUTIVE BRANCH OF CHICAGO."

A governmental body has only the powers of eminent domain that are conferred upon it by the appropriate legislative body, and a statute or ordinance conferring the power of eminent domain must be strictly construed. Forest Preserve District v. Brown Family Trust, 323 Ill. App. 3d 686, 691 (2001). In construing an ordinance, we apply the same principles of construction that we would in construing a statute. Brown Family Trust, 323 Ill. App. 3d at 692. Although an ordinance delegating the power of eminent domain is to be strictly construed, an ordinance is presumed valid, and the burden of establishing invalidity is on those who challenge the ordinance. Brown Family Trust, 323 Ill. App. 3d at 692.

The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature, and the best evidence of this legislative intent is the language employed in the statute itself. Brown Family Trust, 323 Ill. App. 3d at 692. This language must be given its plain and ordinary meaning. Brown Family Trust, 323 Ill. App. 3d at 692. A court is not allowed to ignore the plain meaning by reading into it exceptions, limitations, or conditions that the legislature did not express. Brown Family Trust, 323 Ill. App. 3d at 692. Where statutory language is clear and

-16-

unambiguous, a court must give it effect without resort to other aids of construction. Brown Family Trust, 323 Ill. App. 3d at 692.

Appellants herein fail to quote from, cite to, or even direct this court's attention to the language of the enabling ordinance. The burden is on appellants to establish the invalidity of the ordinance, yet they fail to even direct us to the ordinance. We will not scour the record to develop an issue for a party. See New v. Pace Suburban Bus Service, 398 Ill. App. 3d 371, 384 (2010). Appellants have failed to sustain their burden to establish prejudicial error.

HEARSAY EVIDENCE

Appellants next contend that the trial court erred in allowing the introduction into evidence of two compilation reports of the Federal Aviation Administration (FAA)--its "Environmental Impact Statement" (EIS) and its "Record of Decision" (ROD). The decision to admit or exclude evidence rests within the sound discretion of the trial court, and that decision will not be disturbed in the absence of an abuse of that discretion. Wilbourn v. Cavalenes, 398 Ill. App. 3d 837, 847 (2010). Furthermore, a party is not entitled to reversal based upon a trial court's evidentiary rulings unless the error substantially prejudiced the aggrieved party and affected the outcome of the case. Wilbourn, 398 Ill. App. 3d at 848.

Appellants do not explain what is contained in these documents, under what circumstances the reports were allowed in, what arguments were made, or even how the trial court ruled. This argument is underdeveloped and does not rise to the level necessary for this court to determine error, let alone prejudicial error.

VESTING OF TITLE

Appellants contend that the City did not comply with section 20--5--5(b) of the Act (735 ILCS 30/20--5--5(b) (West 2008)), the quick-take provision. Among other things, section 20--5--5(b) requires that the motion for taking shall state the "formally adopted schedule or plan of operation for the execution of the plaintiff's project." 735 ILCS 30/20--5--5(b) (West 2008). Appellants argue that the "project" for purposes of this requirement is the entire O'Hare modernization program. The City concedes that its motion for immediate vesting of title, brought under the quick-take provision, lists the entire O'Hare modernization program as the project for which the property is to be taken. However, the motion also states that immediate acquisition of the property is necessary for, "among other things, the construction of new Runway 10C/28C." The motion also contains a proposed schedule for the building of that runway, with taxiway construction beginning in July 2010 and completion of the runway in 2012. The City also stated that it anticipated that the relocation process for removal and reinterment of the deceased buried in St. Johannes would take two years from the date of acquisition.

While the language of section 20--5--5(b) is unambiguous and apparently mandatory, appellants do not cite to, nor has our research discovered, any case law holding that such a failure to attach the entire final plan negates quick-take authority. However, in City of Chicago v. First Bank of Oak Park, 178 Ill. App. 3d 321, 328 (1988), which involved condemnation of property for the construction of a "Southwest Rapid Transit Line" in Chicago, the City was alleged to have failed to introduce the final plans for use of the property. The court held:

" 'The fact that the Department of Transportation could not offer extensive plans for every parcel of land sought in the acquisition, or for every phase of a project which would extend over a period of years, did not deprive the Department of authority to condemn the various

tracts.'" <u>First Bank</u>, 178 Ill. App. 3d at 328, quoting <u>Department of Transportation v. Keller</u>, 127 Ill. App. 3d 976, 979 (1984).

The O'Hare modernization program is a massive project involving construction of many elements over many acres of property over a course of many years. Plans for such a massive project change over time. In addition, as we have stated above, our supreme court is "fully committed" to the rule that a condemnor may, and should, anticipate future increased demands for the public use for which the land is being devoted, in addition to sufficient land for the present need. <u>Vaccarro</u>, 408 Ill. at 597.

Here, the City provided a specific timeline for the specific project that affects the property in question. We determine that there has been sufficient compliance with section 20--5--5(b) and that vesting of title by quick-take was proper.

For these reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

ZENOFF, P.J., and HUTCHINSON, J., concur.