# Illinois Official Reports

## Appellate Court

---

**_Enbridge Energy (Illinois), L.L.C. v. Kuerth_, 2016 IL App (4th) 150519**

---

| | |
|---|---|
| Appellate Court Caption | ENBRIDGE ENERGY (ILLINOIS), L.L.C., n/k/a Illinois Extension Pipeline Company, Plaintiff-Appellee, v. DEBRA S. KUERTH, as Trustee of the Debra S. Kuerth Trust, Under the Declaration of Trust Dated January 29, 2007; THE DEBRA S. KUERTH TRUST, Under Declaration of Trust Dated January 29, 2007; NON-RECORD CLAIMANTS; and UNKNOWN OWNERS, Defendants-Appellants.—ENBRIDGE ENERGY (ILLINOIS), L.L.C., n/k/a Illinois Extension Pipeline Company, Plaintiff-Appellee, v. KENNETH L. KUERTH; DIANNE KUERTH; NON-RECORD CLAIMANTS; and UNKNOWN OWNERS, Defendants-Appellants. |
| District & No. | Fourth District<br>Docket Nos. 4-15-0519, 4-15-0520 cons. |
| Filed | December 13, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, Nos. 14-ED-12, 14-ED-13; the Hon. Mark A. Fellheimer, Judge, presiding. |
| Judgment | Vacated; cause remanded with directions. |
| Counsel on Appeal | Thomas J. Pliura (argued), of LeRoy, for appellants.<br><br>John Spesia (argued) and Jacob E. Gancarcyzk, of Spesia & Ayers, of Joliet, and Christopher J. Spanos, of Hinshaw & Culbertson LLP, of Peoria, and Gerald A. Ambrose, Steven J. Horowitz, Brian A. McAleenan, and Dale E. Thomas, of Sidley Austin LLP, of Chicago, for appellees. |

| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Holder White and Pope concurred in the judgment and opinion. |

**OPINION**

¶ 1      In April 2014, the Illinois Commerce Commission (Commission) granted plaintiff, Enbridge Energy (Illinois), L.L.C., now known as the Illinois Extension Pipeline Company (IEPC), eminent-domain authority to acquire easements over certain real estate for the planned construction of an approximately 170-mile liquid petroleum (oil) pipeline project known as the Southern Access Extension (SAX).

¶ 2      In July 2014, IEPC filed separate "complaints for condemnation of permanent and temporary easements for common carrier pipeline" against defendants (1) Debra S. Kuerth and the Debra S. Kuerth Trust (Debra Trust) (Livingston County case No. 14-ED-12; this court's case No. 4-15-0519) and (2) Kenneth L. Kuerth and Dianne Kuerth (Kuerths) (Livingston County case No. 14-ED-13; this court's case No. 4-15-0520) (collectively, landowners) seeking to determine the just compensation for its easement interests in landowners' respective properties. Thereafter, landowners each filed a "traverse and motion to dismiss" (traverse motion), requesting dismissal of IEPC's complaints for condemnation. The trial court later denied landowners' traverse motion.

¶ 3      After IEPC presented evidence at a May 2015 jury trial and conducted a *voir dire* of landowners' damages valuation expert, the trial court granted IEPC's oral motion to exclude the expert's valuation testimony. IEPC then moved for directed verdicts on its condemnation suits and landowners' amended counterclaim for damages to the remainder. Following argument, the court (1) granted directed verdicts in IEPC's favor and (2) awarded compensation of $7000 in case No. 14-ED-12 and $6700 in case No. 14-ED-13 to landowners.

¶ 4      Landowners appeal, raising numerous claims that challenge the trial court's condemnation and traverse judgments. For the reasons that follow, we vacate the court's denial of landowners' traverse motion and remand with directions for further proceedings.

¶ 5                                    I. BACKGROUND
¶ 6                                  A. Procedural History
¶ 7      We provide the following brief synopsis of the pertinent litigation involving the SAX project to place landowners' appeals in context.

¶ 8                    1. *IEPC's Application for a Certificate in Good Standing*
                              *and Eminent-Domain Authority*
¶ 9      In August 2007, IEPC applied for a certificate in good standing and other relief pursuant to section 15-401 of the Common Carrier by Pipeline Law (Pipeline Law) (220 ILCS 5/15-401 (West 2006)). (The Pipeline Law appears under article XV of the Public Utilities Act (220 ILCS 5/1-101 to 20-120 (West 2006)).) IEPC sought the Commission's authorization to (1) construct, operate, and maintain the SAX pipeline; and (2) acquire, when necessary, private

property under eminent-domain authority to install and maintain the SAX pipeline as permitted by section 8-509 of the Public Utilities Act (220 ILCS 5/8-509 (West 2006)). IEPC described the proposed SAX project as a 36-inch diameter underground oil pipeline originating from IEPC's Flanagan terminal located near Pontiac, Illinois, and terminating approximately 170 miles south, at IEPC's Patoka terminal located near Patoka, Illinois. The planned SAX project traversed 679 tracts of land located in the counties of Livingston, McLean, DeWitt, Macon, Shelby, Christian, Fayette, and Marion. IEPC sought (1) a 60-foot wide permanent easement right-of-way for the pipeline and (2) an additional 60-foot temporary easement to facilitate construction.

¶ 10    In July 2009, the Commission issued an order in docket No. 07-0446, granting IEPC a certificate in good standing but denying IEPC's request for eminent-domain authority. As to eminent domain, the Commission urged, instead, that IEPC continue negotiations with landowners who had declined the compensation IEPC had offered in exchange for the aforementioned easements on the landowners' respective properties. The Commission's order provided, however, that IEPC could renew its request for eminent-domain authority by "demonstrating that it has made reasonable attempts to obtain easements, through good-faith negotiations."

¶ 11    Some affected landowners (Intervenors) appealed the Commission's grant of a certificate in good standing, and this court affirmed. *Pliura Intervenors v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 199, 200, 942 N.E.2d 576, 578 (2010) (*Intervenors I*). Specifically, we rejected Intervenors' argument that the Commission erred by determining that (1) IEPC was fit, willing, and able to construct, operate, and maintain an oil pipeline; and (2) a public need existed for the pipeline. *Id.* at 208-09, 942 N.E.2d at 584-85. The Supreme Court of Illinois later denied Intervenors' petition for leave to appeal. *Pliura Intervenors v. Illinois Commerce Comm'n*, 239 Ill. 2d 589, 943 N.E.2d 1108 (2011) (table).

¶ 12                    2. *IEPC's Renewed Petition for Eminent-Domain Authority*

¶ 13    In July 2013, IEPC renewed its request for eminent-domain authority, seeking to condemn 148 of the 679 tracts of land traversed by the planned SAX project route because the owners of those respective properties had either (1) refused to negotiate with IEPC or (2) declined IEPC's compensation offers despite extensive negotiations. (IEPC's continued negotiations reduced the number of "holdout" landowners from 148 to 127, meaning approximately 81% of landowners reached an agreement with IPEC.)

¶ 14    In December 2013, an administrative law judge (ALJ) conducted a hearing on IEPC's request for eminent-domain authority. A senior engineer employed by the Commission testified, in pertinent part, that approval to exercise eminent-domain authority required IEPC to show that (1) reasonable attempts were made to acquire the outstanding land rights through good-faith negotiations and (2) additional attempts to acquire the land rights at issue would have been unsuccessful. In evaluating those metrics, the engineer stated that the Commission considers numerous factors which include—but are not limited to—the following: (1) the number and extent of the petitioner's contacts with the landowner, (2) whether the petitioner explained its compensation offer to the landowner, (3) whether the compensation the petitioner offered was comparable to offers made to similarly situated landowners, (4) petitioner's efforts to address landowner concerns, and (5) the likelihood that further negotiations would be successful. After testifying to IEPC's efforts as to each of these five factors, the engineer

recommended that the Commission approve IEPC's petition for eminent-domain authority. In April 2014, the ALJ recommended that the Commission grant IEPC eminent-domain authority.

¶ 15    Later that month, the Commission issued its written order, in which it (1) accepted the ALJ's recommendation and (2) granted IEPC eminent-domain authority. In so doing, the Commission explained that the grant of a request for eminent-domain authority under section 8-509 of the Public Utilities Act requires "a utility [to] show that it made a reasonable attempt to acquire the property at issue." In this regard, the Commission noted that the aforementioned five factors "should be considered, among others, in determining whether the use of eminent domain is necessary." The Commission then recognized that as to the aforementioned five factors, sufficient evidence was presented to show that (1) the number, nature, and extent of [IEPC's] contacts with the landowners had been adequate; (2) IEPC adequately explained its offer of compensation to landowners; (3) IEPC's offers were comparable to offers made to similarly situated landowners, noting that IEPC's offers for the easements were 125% of fee value; (4) IEPC made an effort to address landowner concerns by making adjustments to the pipeline route to avoid certain structures, land features, or wooded areas; and (5) "given the large numbers of holdouts and the length of time that has elapsed during the negotiation phase, the situation is unlikely to change on a large scale absent the Commission granting [IEPC] the right to exercise eminent domain."

¶ 16    Some Intervenors affected by the Commission's grant of eminent-domain authority appealed, and this court affirmed. *Pliura Intervenors v. Illinois Commerce Comm'n*, 2015 IL App (4th) 140592-U (*Intervenors II*). Specifically, we rejected Intervenors' argument that the Commission's grant of eminent-domain authority was not supported by substantial evidence that IEPC engaged in good-faith negotiations. *Id.*

¶ 17                                    *3. IEPC's Motion To Reopen*

¶ 18    In May 2014, IEPC filed a "Motion to Reopen and Amend Order Concerning Diameter of the [SAX] Pipeline," requesting an amendment to the July 2009 certificate in good standing the Commission issued in docket No. 07-0446. IEPC's amendment sought only to reduce the SAX pipeline diameter from 36 to 24 inches.

¶ 19    In support of its motion, IEPC alleged that uncertain economic conditions and market demand for a different grade of crude oil caused IEPC to reevaluate the original parameters of the SAX project. Based on these changed factors, IEPC calculated that the capacity requirements of the SAX pipeline would be approximately 300,000 barrels per day (bpd) of liquid petroleum, which "can be readily accommodated by a 24-inch outside diameter pipeline." (In their August 2007 application for a certificate in good standing, IEPC determined that the capacity of the 36-inch pipeline was approximately 400,000 bpd.) With regard to its 300,000 bpd approximation, IEPC had received long-term contractual commitments from Marathon Petroleum Company (Marathon) and another undisclosed oil shipper for a total volume of approximately 210,000 bpd. IEPC pledged that the remaining 90,000 bpd capacity would be available to other shippers of light and heavy crude.

¶ 20    In June 2014, the Commission reopened docket No. 07-0446, and at a later evidentiary hearing, an ALJ considered (1) written and oral direct testimony and (2) oral cross-examination testimony on IEPC's May 2014 motion to amend. Thereafter, the parties filed, in pertinent part, additional posthearing briefs. In its November 2014 posthearing reply

brief, IEPC acknowledged that in July 2014, Enbridge Energy Company, Inc. (IEPC's parent company), agreed to sell to a 35% equity interest in the SAX project to Marathon.

¶ 21 In December 2014, the ALJ recommended that the Commission grant IEPC's motion to amend, subject to certain conditions. Later that month, the Commission determined that public convenience and necessity required issuance of the certificate as amended to authorize a 24-inch pipeline. Pertinent to this appeal, the Commission found that (1) a public need for the 24-inch pipeline existed; (2) no other substantial changes specified in the original certificate, such as pipeline route and easement width, were proposed or granted; and (3) the 24-inch pipeline would not impose additional burdens on landowners than the originally proposed 36-inch pipeline.

¶ 22 Intervenors appealed, arguing that the Commission erred by amending the July 2009 certification because (1) the Commission's findings were not supported by substantial evidence; (2) IEPC's certificate in good standing had expired; and (3) IEPC was no longer a common carrier by pipeline because of self-imposed limits that excluded the public. As to its last argument, Intervenors contended that (1) IEPC lost its certification by selling a 35% interest in the SAX project to Marathon; (2) Marathon's 35% interest converted the SAX project into a private pipeline; and (3) the amended 24-inch SAX pipeline discriminated against the general public by not making pipeline capacity available on an equal basis.

¶ 23 In March 2016, this court affirmed the Commission's order, rejecting Intervenors' (1) sufficiency-of-the-evidence, (2) expiration, and (3) private-pipeline claims. *Pliura Intervenors v. Illinois Commerce Comm'n*, 2016 IL App (4th) 150084-U (*Intervenors III*). The Supreme Court of Illinois later denied Intervenors' petition for leave to appeal. *Pliura Intervenors v. Illinois Commerce Comm'n*, No. 120757 (Ill. Sept. 28, 2016).

¶ 24                                    B. The Issues on Appeal

¶ 25 The issues presented in this appeal concern primarily the trial court's rulings as to the following issues: (1) IEPC's condemnation suit, which includes claims regarding the underlying evidentiary rulings; and (2) landowners' traverse motion. We consider landowners' claims in that order.

¶ 26                              1. *The Parties' Pertinent Filings*
¶ 27                       a. IEPC's Final Offers and Condemnation Filings

¶ 28 In separate letters dated May 19, 2014, IEPC proffered a "final offer" of $41,873 to the Debra Trust and $40,305 to the Kuerths "for a [60-foot] permanent right of way and [60-foot] temporary work space to be used as [a] right of way for the [SAX]." IEPC's respective offers also reflected compensation for "any applicable crop damages." IEPC informed landowners that (1) the final offer would expire in 10 days; and (2) if landowners rejected the final offer, IEPC "will have no choice but to file suit against you to condemn the right-of-way property at issue."

¶ 29 In July 2014—after defendants failed to respond to the final offer—IEPC filed separate "complaints for condemnation of permanent and temporary easements for common carrier pipeline" against landowners, seeking to determine just compensation for its corresponding interest in landowners' respective properties. Appended to its motion was the Commission's

April 2014 order, which granted IEPC eminent-domain authority in docket No. 13-0446.

¶ 30                    b. Landowners' Traverse Motions and Discovery Filings

¶ 31    Later in July 2014, landowners each filed a traverse motion in their respective cases, alleging that the following circumstances required dismissal of IEPC's condemnation filing:

"1. [IEPC] is not properly vested with authority to acquire the property of [d]efendants by proceeding in eminent domain.

2. *** [T]he property sought to be acquired *** is not necessary or convenient for the purpose for which it is sought to be taken.

3. *** [T]he amount of property sought to be taken *** is in excess of [IEPC's] needs.

4. [IEPC] does not seek to use the property sought *** for a public use.

5. *** [T]here has been no bona fide attempt to agree with the [d]efendants as to the just compensation and damages to be paid for the property sought to be taken.

6. *** [T]he project for which [IEPC] seeks to acquire the lands of the [d]efendants does not constitute a public convenience or necessity.

7. *** [T]he project does not constitute a common carrier because of restrictions on access to the proposed pipeline.

8. [IEPC's] authority to acquire the property by eminent domain is limited to a project that [IEPC] is no longer pursuing and is not transferrable to a new and different project.

9. [IEPC] does not possess the legal authority to construct the pipeline *** because it has no certificate in good standing *** for the project it is pursuing and the certificate it previously obtained is expired and is not transferable to a different project."

(In case No. 14-ED-12, Debra Trust's traverse motion listed only the first seven allegations.)

¶ 32    In October 2014, landowners filed a memorandum in support of their traverse motions that asserted, in part, that a traverse motion "is not the equivalent" of a motion to dismiss under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2014)). Specifically, landowners alleged that "[t]he filing of a traverse *** motion *** leads to a hearing ***; however, *** *the hearing resembles a trial more than it does a conventional motion hearing*." (Emphasis in original.) Landowners then asserted that "[e]ach point raised in the traverse [motion], to be fully addressed by [landowners] in the required final evidentiary hearing[,] will require additional discovery not available to the [landowners] prior to filing."

¶ 33    Later that month, landowners filed a "consolidated memorandum on the need for discovery prior to the traverse hearing." Landowners contended that discovery was required to show that IEPC "abused its power" by (1) "attempting to pursue a project for which they have no authority," (2) "proceeding in this condemnation action without negotiating in good faith," (3) "attempting an unconstitutionally excessive taking," (4) "authorizing an unconstitutional taking for private benefit," and (5) "attempting an unconstitutional taking that is not for public use."

## c. Landowners' Amended Counterclaim

In November 2014, landowners filed a "counterclaim for damages to the remainder," which they later amended. Landowners' April 2015 amended counterclaim sought compensation from IEPC for the "substantial, irreparable, and unavoidable" damages to the remainder of their respective properties caused by the impending installation of the SAX pipeline.

## d. IEPC's Motions *in Limine*

In March 2015, IEPC filed a series of motions *in limine* seeking to bar the testimony of certain witnesses landowners disclosed pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007). In so doing, IEPC noted the following:

> "In this condemnation case involving a partial taking, the only question for the jury to decide is the just compensation to be paid to the owner of the property sought to be condemned. [Citation.] Just compensation is the fair market value of the subject property at its highest and best use on the date of the filing of the complaint to condemn. [Citation.] [Landowners] have brought a counterclaim for damages to the remainder, which is also measured by calculating the fair market value of landowners' properties, both immediately before and after the taking. [Citation.] Thus, the only specialized knowledge that would assist the trier of fact is expertise in calculating the fair market value of the property." (Internal quotation marks omitted.)

### i. *Carlisle Kelly and Daniel Summann*

IEPC asked the trial court to bar the testimony of Carlisle Kelly and Daniel Summann, whom landowners disclosed as "independent expert witnesses" as defined by Rule 213(f)(2) (Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007)). IEPC alleged that Kelly and Summann were not professional appraisers qualified to provide expert opinions on the fair-market value of real estate. Instead, Kelly and Summann were expected to testify about their personal experience with an IEPC-owned, above-ground pipeline located on their respective properties. IEPC argued that such testimony was "irrelevant, speculative, unfairly prejudicial, and an improper legal conclusion."

### ii. *Landowners*

In January 2015, IEPC deposed landowners separately and asked each whether they could provide an estimate of the fair-market value of their respective properties. Landowners confirmed that they either had "no idea," no opinion, or, in the case of Kenneth, that any valuation he provided would be based on "speculation."

In February 2015, landowners filed "Consolidated *** Supplemental Rule 213(f) Disclosures," in which Debra, Dianne, and Kenneth indicated their intent to provide an opinion as to (1) the fair-market value of their properties before and after installation of the SAX project pipeline and (2) the damages incurred to the value of their remaining property after installation of the SAX project pipeline. Each landowner averred to the following basis for their opinions:

> "[E]xperience as an owner of the land, *** knowledge of the local land prices, research into local area land sales, discussions with local area land owners, discussions with [an]

attorney, research into the environmental effects of pipelines and research onto the stigma and fear caused by pipelines."

¶ 43       In April 2015, landowners filed a document entitled "Consolidated *** Additional Supplemental Rule 213(f)(1) Disclosures," in which Debra and Kenneth reconfirmed their intent to provide lay opinion testimony as to the fair-market value of their properties. Debra and Kenneth revised the basis for their respective opinions, as follows:

> "[The] basis for these opinions is *** knowledge of the real estate market for Livingston County, further research into farm sales, conversations with farm real estate brokers, conversations with farm managers, *** experience as a landowner, *** understanding of the risks associated with the construction of the pipeline through the use of the temporary and permanent easements, including: interference with the rest of the property's farming operations during the construction period and the damages that will occur to the land as a result of the construction process."

Debra and Kenneth also stated that based on their review of the "Enbridge Contractor Safety Program Manual, 2013 edition," mandatory hydrostatic testing would create an unsafe zone for 200 feet on either side of the proposed pipeline, which they opined would "likely create fear and stigma associated with the pipeline and negatively impact the remainder value of their property."

¶ 44       IEPC acknowledged that landowners are competent generally to render opinions concerning the value of their land but sought to bar landowners' valuation testimony because the admissions landowners made under oath at their January 2015 depositions that they had no opinion regarding the value of their land directly contradicted claims landowners made in their subsequent Rule 213(f) disclosures.

¶ 45                                     iii. *Michael S. McCann*

¶ 46       IEPC also sought to bar the testimony of Michael S. McCann, whom landowners disclosed as their "controlled expert witness" under Rule 213(f)(3). Landowners noted, in pertinent part, that McCann's expected testimony concerned the following topics:

> "[McCann] will testify to the concept of and his opinions regarding the 'value of the whole,' value of the temporary easement, value of the permanent easement, fair market value *** before the taking, [fair market value] after the taking, and the damages to the remainder property after the taking and how these concepts apply to these matters. *** McCann will testify to the fair cash market value of the property involved in the condemnation."

¶ 47       Based on discussions with landowners' counsel, IEPC learned that McCann planned to base his valuation, in pertinent part, on recent easement purchases IEPC transacted in Will County. Specifically, landowners' counsel asserted that "[i]t is our position these represent comparable sales, and will be used to determine the value of an easement." Based on these representations, IEPC sought to bar McCann's land valuation as "wildly speculative."

¶ 48                        2. *The Hearings on the Parties' Respective Filings*
¶ 49                        a. Landowners' Traverse Motions and Requests for Discovery
¶ 50       We note that at the time of the October 2014 hearing on landowners' traverse motions and discovery filings, (1) this court had published *Intervenors I*, which affirmed the Commission's

July 2009 grant of a certificate in good standing issued to IEPC in docket No. 07-0446; (2) *Intervenors II*—which challenged the Commission's grant of eminent-domain authority to IEPC in docket No. 13-0446—was pending before this court; and (3) the parties were aware that pending before the Commission was IEPC's motion to amend the certificate in good standing in docket No. 07-0466 to reflect the installation of a 24-inch diameter pipeline instead of a 36-inch diameter pipeline, which this court had yet to consider in *Intervenors III*.

¶ 51       To facilitate the reader's understanding of a traverse motion, we provide a brief synopsis of the motion's purpose, as follows:

"A traverse and motion to dismiss challenge plaintiff's right to condemn defendants' property. [Citations.] It is settled law in Illinois that when a traverse is filed, the burden is on the plaintiff to make a *prima facie* case of the disputed allegations. [Citations.] A *prima facie* case for the necessity of a condemnation is made by introducing a resolution or ordinance of the governing body which makes a finding that the condemnation is necessary. [Citations.] The agency that has been granted the power of eminent domain, rather than the court, has the authority to decide whether the exercise of the power is necessary to achieve an authorized purpose. Absent a clear abuse of this authority, the court will not inquire into the need or propriety of its exercise. [Citations.] Accordingly, where plaintiff establishes a *prima facie* case, it becomes the burden of defendant to show that there was an abuse of discretion by the governing board. [Citations.]" *Lake County Forest Preserve District v. First National Bank of Waukegan*, 154 Ill. App. 3d 45, 51, 506 N.E.2d 424, 428 (1987).

¶ 52       At the hearing on landowners' traverse motions, the parties acknowledged initially that trial courts in Kankakee, McLean, and Will Counties had considered and rejected requests for discovery prior to conducting traverse hearings from similarly situated landowners. Landowners also acknowledged that (1) courts in Will and Kankakee Counties had denied the associated traverse motions and (2) the McLean County court had yet to consider traverse motions.

¶ 53       Landowners argued that discovery was required before the traverse motion hearing to provide further inquiry into whether IEPC (1) was constructing a different pipeline than the SAX project the Commission approved in July 2009 under docket No. 07-0446; (2) provided "bona-fide, good-faith offers" and conveyed the bases for its offers to the affected landowners; and (3) was constructing a private pipeline by virtue of Marathon's ownership interest in the SAX project. Landowners also wanted to conduct discovery to obtain "a chance to question the individuals that have submitted affidavits" regarding their land-valuation methodology.

¶ 54       In response, IEPC argued that the Commission issued two relevant orders in docket Nos. 07-0446 (granting IEPC certification to build SAX) and 13-0446 (granting IEPC eminent-domain authority). IEPC posited that docket No. 07-0446 was a final order by virtue of this court's conclusion on appeal that the Commission correctly determined (1) IEPC "was fit, willing, and able to construct, operate, and maintain" the SAX project; and (2) the SAX project satisfied a public need. *Intervenors I*, 405 Ill. App. 3d at 207-09, 942 N.E.2d at 583-85. As to docket No. 13-0446, IEPC noted that despite Intervenors' appeal to this court, the Commission's grant of eminent-domain authority remained a valid, enforceable order. Because landowners had appeared as Intervenors in those proceedings, IEPC posited that they are not entitled to challenge the Commission's determinations *de novo* in the trial court.

¶ 55    After considering further argument by the parties—which included landowners' claim that the IEPC's certificate in good standing had expired—the trial court took a short recess. Upon reconvening, the court acknowledged that it had reviewed portions of pertinent transcripts and associated orders in the Kankakee, McLean, and Will Counties cases, which had considered the same discovery and traverse arguments. The court explained that in so doing the court was "formulating [its] own opinions" and determining whether those cases "reconcile with [the court's] thoughts or not."

¶ 56    The trial court then denied landowners' request for discovery prior to the traverse hearing. Specifically, the court determined, as follows:

"[The court is] looking here just from a practical standpoint, putting it all together, that if discovery is not going to be permitted on those issues, then [the court] think[s] that would go hand in hand with denial of the motion to dismiss and traverse. *** [I]f it was going to be a *de novo* review and discovery was going to be permitted, then it would make it relevant and material to the motion to dismiss and motion to traverse."

With regard to landowners' claim that IEPC failed to negotiate in good faith, the court found that IEPC's May 2014 final offer was sufficient to show adequate negotiation given landowners' failure to respond to IEPC's final offer.

¶ 57                          b. IEPC's Motions *in Limine*

¶ 58    In May 2015, the trial court made the following rulings on IEPC's motions *in limine*.

¶ 59                          i. *Kelly and Summann*

¶ 60    The trial court granted IEPC's motion to bar Kelly and Summann from testifying, finding that their testimony concerned a different pipeline that traversed a different property. The court explained that any testimony concerning "a possible safety issue in the future" was "speculative and highly prejudicial" given that the fair-market value of the proposed easements was the sole issue before the jury.

¶ 61                          ii. *Landowners*

¶ 62    The trial court granted IEPC's motion *in limine* as to landowners, noting that "it has been quite clear *** that at least to [landowners], they had no opinion." The court noted that landowners subsequently provided opinions concerning values of their property, but the court was not going to "allow someone to facially come up with a number and not be able to support it under the law." The following exchange then occurred between IEPC and the court:

"[IEPC]: *** [J]ust so I am clear, the court is saying that if *** a proper foundation is laid, that [the court is] leaving open that that [landowners] may be able to testify, if there is a proper foundation, as to the per acre value of the farms.

THE COURT: Correct.

[IEPC]: But that is it.

THE COURT: Correct.

[IEPC]: What [the court] is saying is the motion [*in limine*] is granted, so [landowners] are barred from testifying about the value of the permanent easement, the temporary easement, remainder damage, and total just compensation.

THE COURT: That is correct.

[IEPC]: Okay.

THE COURT: *** [The court has] got numbers here that are just numbers ***, but at some point, there was a computation for that. And looking at all the things that [landowners'] opinion consists of, some proper, some improper. So *** other than just mere ownership, getting up and saying, I own the land and it is worth $14,000 an acre, [landowners] are going to have to obviously give some information as to how they arrived at that *** value."

¶ 63                                        iii. *McCann*

¶ 64    As to IEPC's motion *in limine* to bar testimony from McCann regarding recent easement purchases IEPC transacted, the trial court made the following determination:

"[McCann] can give his opinion as to however his formulations, assuming it is a proper foundation, and he is qualified, because [the court has] not heard him testify[.] [B]ut if [McCann] gets up on that stand and *** says I have reviewed *** ten different transactions where [IEPC] or Ameren *** went out and bought easements and they paid XYZ for that, so that is what this one is worth, no."

¶ 65                     c. IEPC's Condemnation Suit and Landowners' Amended
                         Counterclaim for Damages to the Remainder

¶ 66                                    i. *IEPC's Evidence*

¶ 67    At the May 2015 jury trial on IEPC's condemnation motion and landowners' amended counterclaim for damages to the remainder, IEPC offered, and the trial court admitted without objection, IEPC's evidentiary stipulation, which provided, in part, as follows:

"The property rights being acquired *** by *** IEPC include a pipeline right-of-way and perpetual easement to lay, construct, operate, maintain, inspect (including by aerial patrol), remove, alter, replace, relocate[,] and reconstruct a pipeline ***."

IEPC's evidentiary stipulation also stated that "[t]he temporary workspace easements will terminate upon completion of construction but in no case more than two years from the date IEPC is given possession of the property."

¶ 68    Andrew Brorsen, an Illinois licensed certified general real estate appraiser, who has worked in that capacity since 1972, testified that he authored an appraisal report on the Debra Trust's and Kuerths' properties in which he utilized a "comparable sales approach" to determine the valuation of the respective properties. Brorsen explained that the comparative sales approach is the "primary method used throughout the country for appraising rural property." Brorsen added that comparable "[is] generally thought of as the properties that have sold that would be selected for a direct comparison to the property being appraised." Brorsen agreed with the following basic description of that appraisal technique:

"So *** a comparable sales approach [is] where you've got a 54-acre farm, you determine that the highest and best use is agricultural, *** you go out then in the market and look for transactions of agricultural properties that are comparable to that 54 acres."

Brorsen acknowledged that under eminent domain the "fair market cash value" of a particular property involves an exchange in which a buyer makes an offer that a seller is willing to accept absent any compulsion from either the buyer or seller to enter into the financial transaction.

¶ 69 Brorsen used the same six comparable property sales to appraise both the Debra Trust's and Kuerths' properties because landowners' properties were (1) roughly the same size (79.14 acres and 79.10 acres, respectively), (2) located adjacent to one another, and (3) both classified as agricultural for highest and best use purposes. Brorsen then testified in detail to the specifics of the six comparable properties he used to base his appraisal.

¶ 70 With regard to the category of damage to the property, Brorsen explained that to determine the damage caused solely by the easement (the "within the permanent easement" category in the below appraisal summary) is a "difficult" calculation because no open market exists to buy and sell a permanent easement, and as a consequence, a comparable sales analysis based on a willing buyer and seller absent any compulsion does not exist. In this regard, Brorsen's appraisal report provided the following valuation of the permanent easement:

> "The value of the proposed acquisition was based on the same comparable sales data presented for the value of the whole; however, the permanent easement will remain in effect forever, but allows the landowner to continue to use, farm, lease, and cross. Just compensation to the property owner is only for the rights acquired by the pipeline and is not equal to fee value. Based on interviews with market participants, a property with an easement may yield the same unit value as a property with no permanent easement, but may also range to a discount of 50%. The loss or crop damage calculations, if any, are not part of this report and would be handled outside of the aforementioned complaint. In brief, the Value of the Permanent Easement will be 25% of the fee value."

¶ 71 Brorsen added that he calculated the damage to the respective properties within the temporary easement (the "within the temporary easement" category in the below appraisal summary) by using a "cash rental rate of $400 an acre for the contribution of the use of the land for a two-year period." As to the "damages to the remainder" category, Brorsen explained that the land considered in that calculation was the remainder of the property outside of the permanent easement. Brorsen found "no evidence that there was any change in the highest and best use due to the impressments of an easement for a subsurface pipeline."

¶ 72 Based on his comparable sales approach analysis, Brorsen provided the following appraisal summary (Where appropriate, calculations have been rounded to the nearest 100.):

Debra Trust Property

Whole Property Value (79.14 acres x $11,800)   $934,000

Permanent Easement Value (1.861 acres)

| | |
|---|---|
| Before Acquisition (1.861 acres x $11,800) | $22,000 |
| After Acquisition ($22,000 - $5,500) | $16,500 |

- 12 -

Damage to the Property

| | |
|---|---|
| Within Permanent Easement ($11,800 x 1.861 x .25 discount) | $5500 |
| Within Temporary Easement (1.86 acres x $400 x 2 years) | $1500 |
| Damage to the Remainder | $0 |

### Kuerths' Property

| | |
|---|---|
| Whole Property Value (79.10 acres x $11,800) | $934,000 |
| Permanent Easement Value (1.791 acres) | |
| Before Acquisition | $21,100 |
| After Acquisition | $15,800 |
| Damage to the Property | |
| Within Permanent Easement | $5300 |
| Within Temporary Easement | $1400 |
| Damage to the Remainder | $0 |

¶ 73                              ii. *Landowners' Evidence*

¶ 74    Kenneth testified that he was a self-employed farmer who grows corn and soybeans. After testifying generally to his farming experience, his review of farming periodicals, and discussions with his banker, the following exchange occurred:

"[LANDOWNERS' COUNSEL]: [Kenneth], do you have an opinion then as to what the per acre value is of the farm that *** you have owned since 1990 after reviewing all of the periodicals and talking with your banker? Do you have an opinion *** as to what the price per acre would be on [the Kuerths'] tract and [the Debra Trust] tract that you actually farm as well? ***

[IEPC]: Objection *** with respect to comparable sales. Also, [Kenneth] is not *** the landowner for [Debra Trust's] tract. [Kenneth] can't testify to that.

THE COURT: Any response.

[LANDOWNERS' COUNSEL]: *** The law in Illinois is that generally anybody who is familiar with the land can testify as to value. And [Kenneth] farms the tract. He is familiar with the value. ***

[IEPC]: *** The law is the landowner can testify with respect to his value if they have laid a proper foundation.

THE COURT: *** [The court] will sustain the objection on both grounds. So far, [the court has] only heard generalities as to that he referenced. [The court has] no idea what it is anchored toward."

(After asking one more question, landowners' counsel ceased his direct examination of Kenneth.)

¶ 75    Kenneth acknowledged during cross-examination and redirect that he (1) was not an appraiser, (2) had never spoken to McCann, (3) did not know whether the SAX pipeline would affect his ability to farm his property, (4) was aware that others farmed property with existing underground pipelines, and (5) would not be able to build any foundational structure over IEPC's permanent easement.

¶ 76                          iii. Voir Dire *of McCann*

¶ 77    After landowners stated their intent to solicit testimony from McCann, the trial court granted IEPC's oral motion to conduct a *voir dire* to determine whether McCann's valuation opinions met minimum standards of reliability. In this regard, IEPC clarified that they were challenging landowners' ability to proffer comparable sales data to (1) determine the overall value of the Debra Trust's and Kuerths' properties and (2) establish remainder damages.

¶ 78    Outside of the jury's presence, McCann testified that the Rule 213 disclosures on the Debra Trust's and Kuerths' property did not disclose any "specific particular sales" of "individual discreet properties" by highest and best use, location, and size. Instead, McCann provided an oral report to landowners' attorney regarding his "general disclosure" that he had based his valuation opinion on his review of comparable sales. McCann admitted that the previous night, he met with landowners' attorney, and, together, they reviewed 200 sales that were contained in McCann's 7000-page work file that McCann provided to IEPC in January 2015. During their review, McCann and landowners' attorney agreed on "the paired sales examples that I should be prepared to talk about today."

¶ 79    McCann admitted that when he calculated the damages to the remainder of the Debra Trust's and Kuerths' properties, he relied upon the activity that would have been occurring in the temporary construction easement areas. IEPC then began the following exchange by quoting McCann on factors he considered in appraising a property:

"[IEPC]: Quote, remainder valuation considers the added use of pipeline development and use in the [permanent easement] and [temporary construction easement] areas as well as all other easement grant terms contained in the complaints[.]

[McCANN]: Yes. I've just considered all the issues that go into the permanent easement, the temporary easement, what's going into the pipeline easement area itself, how it's going to be used. I've considered all those factors in the damages that I've calculated based on those various components and allocations. ***

[IEPC]: When you say damages, you are including damages to the remainder. Correct?

[McCANN]: I'm including any compensation that the property owner at least in my opinion is entitled *** to make them whole so that the difference in value is compensated for whether it's from the temp[orary] easement, the permanent easement, or any restrictions and impairments to the remainder property.

[IEPC]: That would also include damages to the remainder. Correct?

[McCANN]: Yes. It's damages to the property that the owner will have left."

¶ 80    iv. *The Trial Court's* Voir Dire *and Directed Verdict Findings*

¶ 81    Following argument, the trial court granted IEPC's oral motion to bar McCann's testimony, finding, in pertinent part, that McCann was not qualified to give a valuation opinion.

¶ 82    Landowners then informed the trial court that they had no other witnesses but moved for a continuance, which the court denied following argument. Immediately thereafter, IEPC moved for directed verdicts on its condemnation suits and landowners' amended counterclaim for damages to the remainder. Following argument, the court granted (1) a directed verdict in IEPC's favor and (2) compensation of $7000 in case No. 14-ED-12 and $6700 in case No. 14-ED-13 to landowners.

¶ 83    This appeal followed.

¶ 84                              II. ANALYSIS

¶ 85    As previously mentioned, landowners present numerous arguments challenging the trial court's judgment. Our review of landowners' claims reveals that they concern the following two distinct overarching issues: (1) IEPC's condemnation suit, which includes claims regarding the underlying evidentiary rulings; and (2) landowners' traverse motion. We consider landowners' claims in that order.

¶ 86                        A. IEPC's Condemnation Suit
¶ 87            1. *The Trial Court's Evidentiary Rulings at the May 2015*
                    *Hearing on IEPC's Motion* in Limine

¶ 88    Landowners argue that the trial court abused its discretion by barring (1) landowners' testimony concerning just compensation, (2) the planned testimony of Kelly and Summann, and (3) landowners' testimony concerning other potential dangers associated with the SAX pipeline. We consider landowners' claims in turn.

¶ 89                        a. The Standard of Review

¶ 90    Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's sound discretion, and reviewing courts will not disturb a trial court's evidentiary rulings absent an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008). "The threshold for finding an abuse of discretion is high." *Id.* "A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that that no reasonable [person] would take the view adopted by the court." *Id.*

¶ 91                    b. Landowners' Just Compensation Testimony

¶ 92    Landowners argue that the trial court abused its discretion by barring their testimony concerning just compensation. We disagree.

¶ 93    We note that landowners' challenge does not encompass the trial court's ruling that they could testify generally to the value of their land provided a proper foundation was established. See *Department of Transportation v. White*, 264 Ill. App. 3d 145, 151-52, 636 N.E.2d 1204, 1209 (1994) (landowner is generally qualified to express opinion as to value of their land, but mere ownership is not enough unless landowner is familiar with facts which give the property

value (citing *Department of Transportation v. Harper*, 64 Ill. App. 3d 732, 735, 381 N.E.2d 843, 846 (1978))).

¶ 94    Instead, landowners challenge the trial court's ruling that barred them from providing opinion testimony on the same factors addressed by Brorsen, IEPC's expert appraiser. Specifically, landowners contend that the court abused its discretion by barring their opinions on (1) easement valuation, (2) fair-market value of their respective properties before and after the taking, and (3) damages to the remainder, because the court incorrectly determined that landowners failed to provide a sufficient basis for their proposed opinions. In other words, landowners assert that the court barred the evidence because landowners could not prove that their opinions were reliable—that is, that they had "some peculiar means of forming an intelligent and correct judgment as to [the] value, or the effect upon it of a particular improvement, beyond what is presumed to be possessed by men generally." *Trunkline Gas Co. v. O'Bryan*, 21 Ill. 2d 95, 99, 171 N.E.2d 45, 48 (1960).

¶ 95    Landowners' contention in their consolidated brief to this court that they provided a sufficient basis for their opinions in their (1) February 2015 supplemental Rule 213(f) disclosures and (2) April 2015 additional supplemental Rule 213(f)(1) disclosures is not persuasive. As the trial court correctly noted, in their supplemental and additional Rule 213(f) disclosures, landowners stated that they based their valuation opinions, in part, on "fear" and "stigmatism" associated with oil pipelines, which the court determined was subjective, speculative, and improper evidence. We conclude that the court was well within its discretion to view landowners' testimony as incompetent and, as a result, to bar its admission. See *Department of Transportation v. Rasmussen*, 108 Ill. App. 3d 615, 625, 439 N.E.2d 48, 56 (1982) ("Where a witness has considered improper elements of damage, his testimony will be deemed incompetent, even though in part based upon proper elements.").

¶ 96    In so concluding, we express some skepticism that in the 15 days that passed between landowners' January 22, 2015, discovery depositions—in which they testified that they had no opinion whatsoever of the value of their respective properties—and February 6, 2015—when landowners filed their consolidated supplemental Rule 213(f) disclosures, landowners had acquired a sufficient basis of knowledge to provide credible testimony regarding the elaborate and complex task of land valuation in condemnation proceedings.

¶ 97                                    c. Kelly and Summann

¶ 98    Landowners argue that the trial court abused its discretion by barring the testimony of Kelly and Summann. We disagree.

¶ 99    In support of their argument, landowners cite section 10-5-50 of the Eminent Domain Act (Act), as follows:

> "Evidence is admissible as to: *** (2) any unsafe, unsanitary, substandard, or other illegal condition, use, or occupancy of the property, including any violation of any environmental law or regulation; (3) the effect of such condition on income from or the fair market value of the property ***. Such evidence is admissible notwithstanding the absence of any official action taken to require the correction or abatement of the illegal condition, use, or occupancy." 735 ILCS 30/10-5-50 (West 2014).

¶ 100    Landowners claim that section 10-5-50 of the Act allows the testimony of Kelly and Summann concerning their experiences with other IEPC-owned above-ground pipelines

located on their respective properties. Landowners' reliance, however, is misplaced because section 10-5-50 of the Act applies only "if there was evidence [landowners] used [their] own property illegally before the [condemnation]." *Illinois State Toll Highway Authority v. West Suburban Bank*, 208 Ill. App. 3d 923, 928, 567 N.E.2d 730, 734 (1991).

¶ 101    In this case, the trial court barred Kelly and Summann because the court determined that testimony concerning "a possible safety issue in the future" regarding different pipelines that traversed different properties was "speculative and highly prejudicial." We conclude that the court did not abuse its discretion in so concluding.

¶ 102                    d. Landowners' Testimony as to Other Potential Dangers

¶ 103    Landowners argue that the trial court abused its discretion by barring their testimony concerning other potential dangers associated with the SAX pipeline. We disagree.

¶ 104    The record shows that during the May 2015 hearing on IEPC's motion *in limine*, IEPC sought to bar testimony from landowners regarding how (1) previous oil spills, (2) pipeline strength and leak inspections known as hydrostatic testing, and (3) other IEPC pipelines pose potential hazard risks that devalue the landowners' property. Landowners responded to IEPC's argument by stating (1) "there will be [oil] leaks or there have been oil leaks [that] will place a negative stigma onto the property," (2) the "potential hazard devalues the property," and (3) hydrostatic testing will negatively impact land value. In each instance, the trial court barred the testimony, accepting IEPC's argument that testimony regarding those issues was inappropriate, speculative, and overly prejudicial.

¶ 105    On appeal, we have reviewed landowners' arguments asserting numerous grounds as to how the trial court abused its discretion in barring this testimony, which we do not find persuasive. Accordingly, we conclude that the court did not abuse its discretion by granting IEPC's motion *in limine* as to those issues.

¶ 106                    2. *May 2015 Jury Trial for Condemnation*

¶ 107    As we have already noted, at the May 2015 hearing on IEPC's complaints for condemnation of permanent and temporary easements for common carrier pipeline, the sole issue before the jury was the just compensation IEPC would have to pay landowners for its interests in the Debra Trust's and Kuerths' properties. Accordingly, we confine our analysis to two distinct issues, which we find dispositive—that is, (1) the trial court's determination to bar McCann's expert testimony at that hearing and (2) the court's directed verdict in IEPC's favor. We address each issue in turn.

¶ 108                    a. The Trial Court's Determination To Bar
                         McCann's Expert Testimony

¶ 109    Landowners argue that the trial court abused its discretion by barring McCann's appraisal testimony. We disagree.

¶ 110    Prior to addressing the controversy at issue, we note that in their respective briefs to this court, both parties agree that in *Trunkline*, 21 Ill. 2d at 101, 171 N.E.2d at 49, the supreme court stated, as follows: "It has long been settled that temporary consequential interference with the use of property occasioned by the construction of a public improvement is not a proper element of damage." The supreme court also stated that "where a witness has considered

improper elements of damage, his testimony will be deemed incompetent *** even though in part based upon proper elements." *Id.* at 100, 171 N.E.2d at 48-49.

¶ 111    At the May 2015 jury trial on IEPC's condemnation suit, the following exchange occurred during McCann's *voir dire*, which occurred outside the jury's presence:

"[LANDOWNERS' COUNSEL]: *** [A]fter these proceedings started, did you subsequently come to learn that they had entered into a stipulation regarding the temporary easement and clarified that they would allow individuals access across the temporary easement that were landowners?

[McCANN]: Yes.

[LANDOWNERS' COUNSEL]: *** [D]id that satisfy some of your concerns? Or tell me what your concerns were about that and how that related to the value of the temporary easement.

[McCANN]: Well, certainly. The temporary easement, the initial terms were basically that the easement holder, meaning [IEPC] could keep anybody including the property owner off that temporary easement for the whole duration of it which could make some real issues for using the property beyond that easement.

And when I look at the easement valuations or valuations subject to easement impacts, I interpret it as the full effect of the language of that easement. I don't make assumptions that they won't do what they are saying they have a right to do. I think that's the appropriate way to do it. That's the way I've learned it.

And, but then with that subsequent disclosure that no, we'll allow access across the temporary easement, we won't, you know, completely interfere with their ability to get to the other side of the easement, well, that did soften the effect of the temporary easement."

¶ 112    After argument on whether to exclude McCann's testimony, the trial court stated, as follows:

"I hope the record picks it up clearly here that it's not even a close case in [the court's] mind ***.

So [McCann] told [the court] the foundation of his analysis here for both the easement and the remainder is the issue of the temporary construction easement. That he specifically said also that a buyer that comes in that sees this situation *** it's going to affect the price.

So under any set of circumstances based on what [McCann] said, and [landowner's counsel is] free to disagree with [the court] the record will speak for itself, but [McCann's] out. There is no question in [the court's] mind. [The court] will get reversed *** in a heartbeat if [McCann is] allowed to give an opinion based on *Truckline*."

¶ 113    Landowners contend that (1) "the [trial] court's ruling was based on a misunderstanding of what [McCann] stated [during] *voir dire*" and (2) the confusion created by IEPC's "increasingly hostile *** and misleading manner." We disagree.

¶ 114    Based upon the aforementioned quoted text in response to landowners' *voir dire* questions coupled with McCann's responses, we conclude that the trial court did not abuse its discretion by barring McCann's expert valuation testimony because that testimony contained improper

elements of damage.

b. The Trial Court's Directed Verdict

¶ 116    Landowners argue that the trial court's directed verdict in IEPC's favor was not supported by sufficient evidence. Specifically, landowners contend that IEPC failed to present competent evidence as to the fair-market value of the condemned properties because Brorsen's valuation of the permanent easements on their respective properties was based on "conjecture without basis." We disagree.

¶ 117    Section 10-5-5 of the Act provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." 735 ILCS 30/10-5-5 (West 2014). The goal, in a partial condemnation—such as this one—"is to provide compensation that is 'just' in the sense that it places the landowner in the same economic position after the condemnation as before." *City of Springfield v. West Koke Mill Development Corp.*, 312 Ill. App. 3d 900, 904, 728 N.E.2d 781, 785 (2000). Whether the facts and data relied upon by a given appraiser are reasonably relied upon by experts in the field of real estate appraisals is a determination left to the sound discretion of the trial court. *Southwestern Illinois Development Authority v. Al-Muhajirum*, 348 Ill. App. 3d 398, 401, 809 N.E.2d 730, 732 (2004). The trial court must not abdicate its independent responsibilities to determine whether the underlying bases for a submitted appraisal satisfy the minimum standards of reliability as a condition of admissibility. *Id.* at 401, 809 N.E.2d at 732-33. We review *de novo* the grant or denial of a motion for a directed verdict. *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18, 28, 885 N.E.2d 330, 339-40 (2008).

¶ 118    At the May 2015 jury trial, landowners cross-examined Brorsen concerning his valuations of the damages caused to the respective properties by the existence of the permanent easements IEPC sought. Brorsen explained the methodology he employed, as follows:

> "As I testified yesterday, the value of the permanent easement as part of the whole after the taking is not based on market sales evidence because there is none. It's based on market evidence that we've extracted from landowners and brokers and farmers, everyone says there's a value loss of some type but they don't know exactly what it is."

¶ 119    Brorsen explained further that in his discussions with other landowners, brokers, and farmers—which he documented in his work file—some opined that the damage to the property caused by the condemned land was 100% of the land value prior to the condemnation, while other opined that it was 0%. Brorsen did not rely on those extreme valuations, explaining, for example, that although the Kuerths were losing some of the rights they enjoyed in the 1.791 acres of condemned land before IEPC's condemnation (*i.e.*, prohibited from excavating or building a structure over the 1.791 acres), landowners did not relinquish all their rights (*i.e.*, could still traverse, farm, or sell the 1.791 acres).

¶ 120    Brorsen noted that under such a scenario, "[i]t has to be logical that there is a value for that permanent easement," given the small portion of rights landowners cede to IEPC. After assessing numerous personal opinions, as well as other market factors "to determine what the market recognizes as the value of a permanent easement impressed with a pipeline easement," Brorsen determined that a 25% discount rate was appropriate. Brorsen then applied that discount rate to the Kuerths' property in the following manner: 1.791 acres (size of permanent easement) x $11,800 (per-acre valuation pre-taking) x .25 (discount rate) = $5283.45 (rounded to $5300). Brorsen also applied this methodology to the Debra Trust property.

¶ 121　　As we have already noted, landowners' claims regarding the use of comparable sales of other easements to determine the value of the damages to the property caused by the permanent easements at issue in this case have no merit because no such marketplace exists. Through his testimony and accompanying report, Brorsen detailed the extensive nature of his appraisal, which included the methodology he employed to determine the damages to the respective properties by the existence of the permanent easements.

¶ 122　　When landowners rested their case in chief, the only competent evidence presented to the jury on the sole issue before it was Brorsen's expert opinion regarding the compensation landowners were entitled to receive for IEPC's interest in their respective properties. Landowners failed to present *any* evidence to refute Brorsen's opinion. We conclude that given the absence of testimony the jury could have weighed against Brorsen's opinion, the trial court properly granted IEPC's motion for a directed verdict. Accordingly, we reject landowners' claim to the contrary.

¶ 123　　　　　　　　　　　　　B. Landowners' Traverse Motion

¶ 124　　　　　　　　　　　　　1. *The Statute at Issue*

¶ 125　　In January 2007, the General Assembly enacted the Act. Pub. Act 94-1055 (eff. Jan. 1, 2007) (adding 735 ILCS 30/1-1-1 to 99-5-5). In so doing, the legislature repealed article VII of the Code of Civil Procedure, which had governed eminent domain proceedings prior to January 2007. See Pub. Act 94-1055, § 95-1-5 (eff. Jan. 1, 2007) (repealing 735 ILCS 5/7-101 to 7-129). The legislature passed the Act "in an attempt to limit the use of condemnation power to assist private development." Richard F. Friedman, *Initial Procedures and Pleadings of the State and Other Condemning Bodies*, in Illinois Eminent Domain Practice § 2.1 (Ill. Inst. for Cont. Legal Educ. 2013). As a result, a major revision from article VII was the codification of the standards of proof for acquisitions when the ultimate user is not a governmental body but, instead, a private entity. *Id.* The revisions included a new provision, section 5-5-5(c) of the Act, which states, in pertinent part, the following:

　　　　"Evidence that the [Commission] has granted a certificate or otherwise made a finding of public convenience and necessity for an acquisition of property (or any right or interest in property) for private ownership or control (including, without limitation, an acquisition for which the use of eminent domain is authorized under the Public Utilities Act ***) to be used for utility purposes creates a rebuttable presumption that such acquisition of that property (or right or interest in property) is (i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose." 735 ILCS 30/5-5-5(c) (West 2014).

¶ 126　　　　　　　　2. *The Operation of Presumptions and Rebuttable Presumptions*

¶ 127　　Because section 5-5-5(c) of the Act refers to a "rebuttable presumption," we provide the following discussion of that concept.

¶ 128　　　　　　　　　　　　a. Presumptions in Civil Proceedings

¶ 129　　Illinois Rule of Evidence 301 (eff. Jan. 1, 2011), entitled "Presumptions in General in Civil Actions and Proceedings," provides, as follows:

"In all civil actions and proceedings not otherwise provided for by rule, statute[,] or court decision, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

¶ 130                                    b. Rebuttable Presumptions in Civil Proceedings

¶ 131        In *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 448 N.E.2d 872 (1983), the supreme court provided the following guidance on rebuttable presumptions:

" 'With regard to the procedural effect of presumptions, most jurisdictions in this country follow the rule that a rebuttable presumption may create a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption. However, once evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed. [Citation.] The burden of proof thus does not shift but remains with the party who initially had the benefit of the presumption. Consistent with this view, Dean Wigmore states in his treatise on evidence that "the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent. If the opponent *does* offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule ***." (9 Wigmore, Evidence sec. 2491, at 289 (3d ed. 1940).)' " (Emphases in original.) *Id.* at 460-61, 448 N.E.2d at 875-76 (quoting *Diederich v. Walters*, 65 Ill. 2d 95, 100-01, 357 N.E.2d 1128, 1130-31 (1976)).

¶ 132        The doctrine that *Franciscan Sisters* and *Diederich* describe is sometimes referred to as Thayer's bursting bubble theory. *Id.* at 466, 448 N.E.2d at 878; see also *In re Estate of Walsh*, 2012 IL App (2d) 110938, ¶ 59, 972 N.E.2d 248 (applying the bursting bubble theory). Under this theory, once evidence had been presented to rebut the operative presumption, that presumption bursts, and the trier of fact then considers the evidence presented in the case as if the presumption had never existed. *Franciscan Sisters*, 95 Ill. 2d at 466, 448 N.E.2d at 878; *Walsh*, 2012 IL App (2d) 110938, ¶ 59, 972 N.E.2d 248. The obvious question then is, "How much evidence is required to rebut the presumption?"

¶ 133        The amount of evidence required from an adversary to rebut the presumption is not determined by any fixed rule. *Franciscan Sisters*, 95 Ill. 2d at 463, 448 N.E.2d at 877. The party contesting the presumption must present "sufficient evidence to support a finding of the nonexistence of the presumed fact." *R.J. Management Co. v. SRLB Development Corp.*, 346 Ill. App. 3d 957, 965, 806 N.E.2d 1074, 1081 (2004). Occasionally, however, courts have imposed a greater burden of production upon a party challenging a presumption than merely presenting sufficient evidence to support a finding as to the nonexistence of the presumed fact. Michael H. Graham, Graham's Handbook of Illinois Evidence § 301.5, at 118 (10th ed. 2010). Such a presumption is sometimes referred to as a " 'strong' " presumption. *Id.*

¶ 134    Due to compelling policy considerations, a party challenging a strong presumption must present clear and convincing evidence to rebut the presumption. *R.J. Management Co.*, 346 Ill. App. 3d at 965, 806 N.E.2d at 1081. The clear and convincing standard requires proof greater than a preponderance but not quite approaching the criminal standard of proof beyond a reasonable doubt. See *Altenheim German Home v. Bank of America, N.A.*, 376 Ill. App. 3d 26, 37, 875 N.E.2d 1172, 1182 (2007) (applying the clear and convincing standard to the presumption that an adopted child is a descendent of the adopting parent for inheritance purposes). Although this strong presumption commonly arises in fiduciary relationships, it has also been applied in other contexts.

¶ 135    For example, in *Layton v. Layton*, 5 Ill. 2d 506, 508, 126 N.E.2d 225, 226 (1955), the sole question before the supreme court concerned whether the valid delivery of a land deed had occurred. Testimony presented on that question showed that a husband and wife owned certain real estate as joint tenants. *Id.* at 507, 126 N.E.2d at 225. The husband later executed a quitclaim deed in which he conveyed his interest in the property to his wife. *Id.* When the parties later separated, a dispute arose as to whether the husband delivered the quitclaim deed to his wife. *Id.* at 507, 126 N.E.2d at 225-26. The husband claimed that although he had spoken with his estranged wife about the deed before their separation, (1) the wife told him that she had not seen the deed, (2) he surmised the deed was no longer valid, and (3) he thought the deed was probably destroyed. *Id.* at 508-09, 126 N.E.2d at 226. The wife testified that after her husband executed the deed, he presented it to her, which was a complete surprise. *Id.* at 509, 126 N.E.2d at 226. Thereafter, the deed remained in a desk drawer located in the living room of the home they shared. *Id.* After their separation, the wife recorded the deed as her attorney instructed. *Id.*

¶ 136    Prior to answering the question at issue in that case, the supreme court noted that "the possession of a deed by the grantee raises a presumption that the deed was delivered, and only clear and convincing evidence can overcome that presumption." *Id.* at 510, 126 N.E.2d at 227. The supreme court then determined that the husband's testimony was neither clear nor convincing because (1) he had contradicted himself during cross-examination and (2) his testimony at trial was inconsistent with previous evidentiary stipulations and his earlier deposition testimony. *Id.* at 511, 126 N.E.2d at 227. The supreme court concluded that "[w]hen the [husband's] testimony is weighed against the evidence adduced on the [wife's] behalf, it is clear that he failed to sustain his burden of proving nondelivery of the deed." *Id.* at 511-12, 126 N.E.2d at 227.

¶ 137    In *Mitchell v. Tatum*, 104 Ill. App. 3d 986, 988, 433 N.E.2d 978, 980 (1982), the clear and convincing standard was applied to determine whether the sheriff's return of service was *prima facie* proof that service of process was successfully executed. In this regard, the appellate court stated that "[t]his court is required to indulge every presumption in favor of the sheriff's return." See also *In re Application of the County Treasurer & ex officio County Collector*, 301 Ill. App. 3d 672, 677, 704 N.E.2d 910, 913 (1998) (to overcome the presumption that redemption of property after tax sale has been made on behalf of proper party, the burden is substantial and not minimal); *La Salle National Bank v. County of Du Page*, 54 Ill. App. 3d 387, 393, 369 N.E.2d 505, 510 (1977) (presumption in favor of validity of zoning ordinance must be rebutted by clear and convincing evidence).

¶ 138    The same compelling policy considerations that justify the strong presumptions in the above cited cases justify the strong presumption in this case. Indeed, on direct appeal from a

decision of the Commission, this court is supposed to be deferential to the expertise possessed by that agency when reviewing its decisions. In *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶¶ 22-23, 25 N.E.3d 587, the Supreme Court of Illinois considered an appeal brought by the Attorney General and certain citizens groups from a decision of the Commission regarding changes made for natural gas charges to the utility customers and, in pertinent part, wrote the following:

> "Section 10-201(d) of the [Public Utilities] Act states that any decision by the Commission is 'prima facie reasonable' (220 ILCS 5/10-201(d) (West 2010)), so a party challenging such a decision bears the burden of proof to show it is unreasonable. Thus, in an appeal like this one, our authority is deferential by statute, but it is also by nature. Simply put, we are judges, not utility regulators. Though we are free to disagree with the Commission on what the [Public Utilities] Act means [citation], we remain hesitant to disregard how the Commission applies it [citation]. *The Commission's interpretation of the [Public Utilities] Act is accorded deference because administrative agencies enjoy wide latitude in effectuating their statutory functions.* [Citations.]
>
> Deference to the Commission is 'especially appropriate in the area of fixing rates.' [Citations.] As we recognized in [citation] 'the determination of rates is not a matter of formulas but one of sound business judgment,' which the General Assembly has entrusted to the Commission, and not to the courts. [Citations.] A rate is more than a number; it is also a design. The Commission's decision in a rate case does not involve simply what utilities may charge their customers, but how they do so. [Citation.] And that decision depends largely upon the Commission's experience and expertise in its field. [Citation.] ('Because of its complexity and need to apply informed judgment, rate design is uniquely a matter for the Commission's discretion.')." (Emphasis added.)

¶ 139 The aforementioned quoted passage is consistent with a case the supreme court considered over 20 years ago, which affirmed this court's judgment. In *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 11-12, 643 N.E.2d 719, 725 (1994), the supreme court wrote the following:

> "The Commission is the fact-finding body in the ratemaking process. On appeal from an order of the Commission, its findings of fact are to be considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof on all issues raised in an appeal is on the appellant. [Citations.]
>
> An order of the Commission will be reversed only if it is outside the jurisdiction of the Commission or is not supported by substantial evidence, or if the proceedings or manner in which the order was arrived at violated the State or Federal Constitution or relevant laws, to the prejudice of the appellant. [Citations.] *It is well settled that a decision of the Commission is entitled to great deference because it is the 'judgment of a tribunal appointed by law and informed by experience'* [citation]." (Emphasis added.)

¶ 140 Of course, the appeal now before this court does not involve a review of Commission rate setting. Nonetheless, the foregoing authority supports the proposition that the Commission, having been vested with authority by the legislature to resolve the technical issues that come before it, and presumably possessing the expertise to do so, should similarly be accorded deference with regard to the issues concerning the construction of a pipeline in this state.

Deeming the Commission's findings worthy of a strong presumption is merely an acknowledgement of that expertise and would serve as a caution to trial courts to not easily disregard the findings of the Commission. Strong public policy favors that the landowners should be required to present clear and convincing evidence before the applicable rebuttable presumptions burst.

¶ 141                               3. *The Standard of Review*

¶ 142    When reviewing the denial of a traverse motion, this court considers whether the trial court's determination was against the manifest weight of the evidence. *City of Chicago v. Zappani*, 376 Ill. App. 3d 927, 931, 877 N.E.2d 17, 21 (2007). "Specifically, the manifest weight of the evidence standard is applied to the trial court's finding that a condemnor acted in good faith." *Id.* at 931-32, 877 N.E.2d at 21-22.

¶ 143                             4. *Landowners' Claims of Error*

¶ 144    Landowners argue that the trial court erred by denying their traverse motions because (1) the court denied discovery on issues raised concerning the propriety of the Commission's certification process for the SAX project; (2) IEPC's certificate in good standing had expired; (3) the SAX project was not primarily for the benefit, use, or enjoyment of the public; and (4) IEPC failed to make good-faith offers prior to filing its condemnation suit. For the reasons that follow, we vacate the court's denial of landowners' traverse motion.

¶ 145    As we have previously noted, a landowner may challenge a condemnation action by filing a traverse motion. *City of Chicago v. Midland Smelting Co.*, 385 Ill. App. 3d 945, 965, 896 N.E.2d 364, 383 (2008). By definition, a traverse is a "formal denial of a factual allegation made in the opposing party's pleading." Black's Law Dictionary 1506 (7th ed. 1999). When such a motion is filed, the authority condemning the property bears the burden of establishing a *prima facie* case as to any disputed allegations. *Midland Smelting Co.*, 385 Ill. App. 3d at 965, 896 N.E.2d at 383. "However, the introduction into evidence of a valid ordinance reciting the necessity for taking private property for a public purpose establishes a *prima facie* case authorizing the acquisition of the property in question, making it the burden of the party challenging the condemnation to come forward with evidence that the condemnor abused its discretion with respect to its decision concerning the necessity of the taking." *Id.*

¶ 146    Application of the plain language of section 5-5-5(c) of the Act to the facts of this case shows that in July 2014—when IEPC filed its complaint for condemnation of landowners' respective properties—the rebuttable presumptions of that section applied regarding IEPC's claim that its interest in those specific properties was (1) primarily for the benefit, use, or enjoyment of the public; and (2) necessary for public purpose. Although section 5-5-5(c) of the Act does not mention good-faith negotiations, "the question of whether a condemnor has negotiated in good faith bears directly on whether the condemnor was exercising its right of eminent domain improperly." *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 480-81, 810 N.E.2d 1, 7 (2004). Indeed, a condition precedent to condemnation proceedings is the requirement that the condemnor engaged in good-faith negotiations with the landowner (*Zappani*, 376 Ill. App. 3d at 932, 877 N.E.2d at 22)—the existence of which establishes a *prima facie* case that a landowner must rebut with relevant evidence (*Midland Smelting Co.*, 385 Ill. App. 3d at 965, 896 N.E.2d at 383).

¶ 147    In this case, IEPC established a *prima facie* case that it had engaged in good-faith negotiations with landowners based upon the Commission's April 2014 ruling, which granted IEPC eminent-domain authority to acquire the property interests at issue. The Commission's grant of eminent-domain authority to IEPC was based on testimony provided by three witnesses at a December 2013 hearing regarding (1) the appraisal process IEPC used to calculate the offers and (2) IEPC's attempts to, thereafter, negotiate with landowners. See *Intervenors II*, 2015 IL App (4th) 140592-U, ¶¶ 14-29 (summarizing the testimony IEPC presented before the Commission in support of its renewed request for eminent-domain authority). After considering that evidence, the Commission applied its experience and expertise in such matters and granted IEPC eminent-domain authority to acquire the remaining easements to complete the SAX project. The Commission's conclusion could only come after the Commission had first determined that IEPC had engaged in good-faith bargaining with landowners. Given the (1) procedure the Commission employed before it granted eminent-domain authority and (2) Commission's applied expertise in such matters, we deem that the Commission's good-faith determination—although not identified specifically as a rebuttable presumption under section 5-5-5(c) of the Act—should be afforded substantial deference by the trial court.

¶ 148    Accordingly, based on the aforementioned recitation of the purpose of a traverse hearing and the plain language of section 5-5-5(c) of the Act, we hold that when the Commission granted IEPC a certificate in good standing to construct the SAX project and, later, granted IEPC eminent-domain authority to complete the SAX project, IEPC enjoyed two rebuttable presumptions—that is, that IEPC's interest in landowners' respective properties was (1) primarily for the benefit, use, or enjoyment of the public; and (2) necessary for a public purpose. For reasons that we have already mentioned, in addition to those two rebuttable presumptions, the Commission's determination that IEPC engaged in good-faith negotiations, which was a necessary finding to its grant of eminent-domain authority in IEPC's favor, warrants substantial deference by the trial court. Thus, after filing their respective traverse motions, landowners were entitled to present relevant evidence to rebut and refute, respectively, those three issues.

¶ 149    Although the General Assembly enacted section 5-5-5(c) of the Act to protect landowners' property interests from condemnation proceedings in favor of private development, that section also serves to reinforce what this court has long held. In *Illinois Power Co. v. Lynn*, 50 Ill. App. 3d 77, 78, 365 N.E.2d 264, 265 (1977), a utility brought an action to acquire certain tracts of land by eminent domain pursuant to authority granted to it by the Commission in a certificate of convenience and necessity and an enabling order. The landowners filed a motion to dismiss and traverse, which the trial court denied. *Id.* Specifically, the court found that "the question of public need for this tract had been resolved in the hearing before the *** Commission, in which defendants actively participated as parties." *Id.*

¶ 150    On appeal, this court identified the question before it as whether the "Commission's finding that the needs and plans of the utility constitute a 'public use,' and that certain properties need be acquired to develop those plans, preempt the courts from inquiring into these same subject matters, where the property owners fully participated as a 'party' before the Commission." *Id.* In answering that question, this court determined that because trial courts were not preempted from inquiring into the same subject matter as the Commission during

certification proceedings, the court erred by dismissing the landowners' traverse motion on that ground. *Id.* at 82, 365 N.E.2d at 268. In so concluding, we stated, as follows:

> "In essence then, the property owners there, as here, were not 'parties to the proceedings' in the sense of parties to a litigation. The hearing was on the reasonableness of the utility's *plans* and could not confer property rights. Appeal of the order of the *** Commission to the courts as provided by statute would only have been a review of the proposed plan for development of the project and the extent of the property to be sought. The appearance of the owners before the *** Commission to give input into the plans, or object thereto, could not bar them from later exercising their rights as owners of property being taken for a public use." (Emphasis in original.) *Id.* at 81-82, 365 N.E.2d at 267.

See also *Adams County Property Owners & Tenant Farmers v. Illinois Commerce Comm'n*, 2015 IL App (4th) 130907, ¶¶ 47-51, 36 N.E.3d 1019 (citing *Lynn* approvingly).

¶ 151        The Commission's July 2009 grant of a certificate in good standing and April 2014 grant of eminent-domain authority and the rebuttable presumptions those decisions generated in IEPC's favor were merely the first steps in this process. The trial court's dismissal of landowners' traverse motions effectively deprived landowners of exercising the option of presenting relevant evidence to (1) rebut the presumptions of public use and public necessity that IEPC possessed when it filed its condemnation suit and (2) refute the Commission's determination that IEPC had engaged in good-faith negotiations when the Commission granted IEPC eminent-domain authority. Accordingly, we vacate the court's denial of landowners' respective traverse motions and remand for limited proceedings, as we will further explain. We are also retaining jurisdiction of this appeal.

¶ 152                    C. The Procedural Posture of This Court's Remand

¶ 153        Prior to providing the trial court specific directions, we first discuss the procedural posture of this court's remand.

¶ 154        Over 23 years ago, this court considered the propriety of a trial court's determination, which affirmed a decision by a regional board of school trustees to dissolve a school district and transfer the responsibility of educating the students affected to a neighboring school district. *Board of Education of Wapella Community Unit School District No. 5 v. Regional Board of School Trustees*, 245 Ill. App. 3d 776, 778, 614 N.E.2d 1383, 1385 (1993) (*Wapella I*). Objectors to the dissolution appealed, challenging the regional board's (1) determination that the petition for dissolution was legally sufficient with regard to the number of qualifying signatures from registered voters and (2) denial of their request to be heard on their objections during a November 2009 hearing before the regional board. *Id.* at 779, 614 N.E.2d at 1386.

¶ 155        Following oral arguments, this court concluded, as follows:

> "We have heard this appeal on an expedited basis because of the need of the school districts involved and their personnel to make immediate plans. We ordered an accelerated briefing schedule and we now shape the procedural aspects of our decision with the need for a speedy resolution of this dispute in mind. We conclude that the request to withdraw signatures was ineffective and that the Regional Board's determination to have the entire territory of Wapella annexed to Clinton was not contrary to the manifest weight of the evidence. However, although section 7-2a(b) of

the [School] Code [(105 ILCS 5/7-2a(b) (West 1992))] makes no express provision for a hearing upon objections to the petition, we hold that the Regional Board should have permitted the objectors to be heard. Accordingly, we will remand to the Regional Board to conduct such a hearing. Our ultimate decision will turn on that issue." *Id.*

¶ 156   In remanding to the regional board for further proceedings, this court provided the following direction:

"We remand the cause to the Regional Board with directions to hold a hearing upon the objections to the petition filed in this cause within 14 days from the issuance of this opinion. The Regional Board is directed to certify its ruling on those objections to this court together with a record of those proceedings within seven days following the hearing. Upon receipt of the foregoing, we will make a decision in this case consistent with this opinion but dependent upon the hearing on the objections and the ruling thereon. No further briefing or arguments will occur unless we so request." *Id.* at 785, 614 N.E.2d at 1390.

¶ 157   After the regional board complied with this court's directions on remand by holding a hearing on objectors' challenges, the regional board certified its decision to this court, which reaffirmed its dissolution determination. *Board of Education of Wapella Community Unit School District No. 5 v. Regional Board of School Trustees*, 247 Ill. App. 3d 555, 557, 617 N.E.2d 442, 444 (1993) (*Wapella II*). Objectors argued to this court—as they did to the regional board—that the regional board could not act without a mandate from this court. In rejecting objectors' argument, we noted the following concerning this court's opinion in *Wapella I*:

"[*Wapella I*] neither affirmed, reversed, nor modified the order on appeal. However, the opinion indicated approval of all of the actions of the Regional Board except for its ruling prohibiting the request of the objectors to be heard on the question of the sufficiency of the petition to dissolve. Accordingly, we remanded to the Regional Board with directions to hold an evidentiary hearing on those objections and to certify its ruling to us on an expedited basis.

\* \* \*

The objectors' theory in regard to the Regional Board's jurisdiction is based upon the premise that it could not act without a mandate. However, as we have indicated, our previous opinion in this case neither affirmed, reversed, nor modified any part of the order on appeal. We remanded for an evidentiary hearing on a single point, but we did not abdicate any part of our general jurisdiction of the matter. [Citation.] Thus we did not enter a judgment and no mandate was appropriate. No new notice of appeal was necessary for this court to obtain jurisdiction to rule on the case because this court never lost jurisdiction of the appeal. We hold that our opinion was sufficient to vest the Regional Board with authority to hold the July 6, 1993, hearing and that board properly proceeded in the face of the objectors' assertion of lack of jurisdiction." *Id.* at 557-58, 617 N.E.2d at 443-44.

¶ 158   In the instant case—as in *Wapella I*—we have vacated the trial court's denial of landowners' traverse motions and are remanding for the expedited and limited purpose of permitting landowners to present relevant evidence to (1) rebut the presumptions of public use and public necessity IEPC possesses and (2) refute the Commission's finding that IEPC acted in good faith when negotiating with landowners. Although we have also expressed our

- 27 -

approval of the trial court's evidentiary and valuation determinations in this case, we have not yet affirmed, reversed, or modified the trial court's judgment. Our ultimate determination in this case will occur only after the trial court conducts a proper traverse hearing in accordance with this court's direction, certifies the record to this court, and the parties have an opportunity to supplement their briefs to this court with regard to the trial court's expedited traverse ruling. Accordingly, as this court held in *Wapella II*, because no judgment has been rendered by this court (1) no mandate need issue and (2) this court retains general jurisdiction. More important, upon the filing of this opinion, the trial court is vested with the authority to conduct an expedited hearing for this limited purpose in accordance with the following directions we now provide.

¶ 159                                  D. Directions on Remand

¶ 160     As earlier mentioned, the parties' dispute began in earnest when IEPC filed its August 2007 application for a certificate in good standing to construct the SAX project. During the nine years that followed, the parties have engaged in extensive litigation, which included landowners' separate challenges to the Commission's (1) certification that IEPC was a common carrier by pipeline and thus, authorized to construct the SAX project; (2) grant of eminent-domain authority in IEPC's favor to acquire easements from recalcitrant landowners to complete construction of the SAX project; and (3) approval for IEPC to amend the SAX project. As this list suggests, the parties have already expended a great deal of time and judicial resources litigating issues involving the SAX project.

¶ 161     At oral arguments in this case, IEPC accused landowners of engaging in a pattern of obstructionist litigation by continually attacking the Commission's certification and eminent-domain determinations, which this court had since affirmed on appeal. Although IEPC's claims regarding landowners' blunderbuss approach have some justification, we note that at the October 2014 traverse hearing, IEPC complicated the trial court's consideration by not conceding the obvious—that is, as to landowners' respective properties, *Lynn* and section 5-5-5(c) of the Act clearly permitted landowners to present relevant evidence to rebut the public-use and public-necessity presumptions IEPC enjoyed by virtue of the Commission's certification and eminent-domain determinations. In addition, landowners were also entitled to challenge the Commission's determination that IEPC had engaged in good-faith negotiations when the Commission granted IEPC eminent-domain authority. We sympathize with the trial court as it attempted to wrestle with these complicated issues.

¶ 162     At the October 2014 hearing on landowners' traverse motions, IEPC argued that the trial court should not consider landowners' claims because they had already been resolved by the Commission and affirmed on appeal by this court. For the reasons this court has already mentioned, IEPC's position was not correct. Nonetheless, the question that remains is, what sort of hearing would be appropriate under these circumstances? Given the length of time and amount of resources already expended in litigating the construction of the SAX project, we provide the following directions for remand in the interest of judicial economy and finality.

¶ 163                          1. *Limited Scope of the Traverse Hearing*

¶ 164     As previously noted, in July 2014—when IEPC filed its complaints for condemnation against landowners' respective properties—IEPC enjoyed the rebuttable presumptions that its interests in landowners' respective tracts of land were (1) primarily for the benefit, use, or

enjoyment of the public; and (2) necessary for a public purpose. In addition to those presumptions, the Commission determined that eminent-domain authority in IEPC's favor was warranted because good-faith negotiations between IEPC and landowners had failed. Thus, landowners were entitled to present relevant evidence to rebut these specific presumptions and to refute the good-faith finding. We note, however, that in their July 2014 traverse motions, landowners disregarded the limited scope of the traverse hearing by attempting to litigate anew the Commission's certification and eminent-domain decisions, which this court affirmed on appeal. In this regard, landowners claim that (1) IEPC is "not properly vested with authority to acquire" their tracts of land, (2) the SAX project did not "constitute a common carrier because of restrictions on access to the proposed pipeline," (3) the Commission's grant of eminent-domain authority did not apply to the current SAX pipeline project, and (4) IEPC did not possess the legal authority to construct the SAX pipeline project. Such issues are not the proper subjects of a traverse hearing, and on remand, the trial court should decline to consider them.

¶ 165    Our determination as to the proper scope of a traverse hearing is not new or novel. In *Department of Transportation v. Keller*, 127 Ill. App. 3d 976, 469 N.E.2d 262 (1984), respondent landowners argued that the trial court erred by restricting testimony as to the issue of necessity at a traverse hearing. In affirming the court's judgment on appeal, the appellate court stated, as follows:

"[T]he issue of whether the acquisitions are 'necessary,' [is] subject to two meanings, one of which forms the basis of an inquiry which is properly before the court, and one of which [does] not. This is another way of stating that the term 'necessary,' for purposes of condemnation proceedings, is subject to a definition other than that to which the term is subject in common discourse. This distinction was recognized implicitly by the Supreme Court of Illinois in *Department of Public Works & Buildings v. Lewis*[, 411 Ill. 242, 245-46, 103 N.E.2d 595, 597-98 (1952)]:

'The word "necessary" in statutes such as the [Act] "should be construed to mean 'expedient,' 'reasonably convenient,' or 'useful to the public,' and cannot be limited to an absolute physical necessity." [Citations.] Conversely, the word "necessary" does not mean "indispensable" *** or "an absolute necessity." The general rule is that, where the right of eminent domain is granted, the necessity for its exercise, within constitutional restrictions, is not a judicial question, and its exercise is not a proper subject for judicial interference or control unless to prevent a clear abuse of such power. [Citations.] This Court *** in *Smith v. Claussen Park and Levee Drainage District*, 229 Ill. 155, 163[, 82 N.E. 278, 281 (1907)], stated, "If the court finds that the use for which the property is to be taken is a public one, then the court will not inquire into the extent to which the property is necessary for such use unless it appears that the quantity of property taken is grossly in excess of the amount necessary for the use." '

The question of whether a public taking is 'necessary,' then, may be an inquiry directed to one of two fields of reference. It may, first, constitute an attempt to determine the veracity of that proposition of which the petitioner is obliged to make a *prima facie* showing in the first instance—*i.e.*, that the purpose for which the land is sought is one of public convenience, and the acquisition, reasonable in scope, is an expedient means of accomplishing the purpose. It may, second, constitute an attempt to

determine whether, given the legitimacy of the project, a given acquisition is 'indispensable'—*i.e.*, the only means of accomplishing a purpose, the public convenience and reasonable scope of which are not at issue. According to the rule set forth in *Lewis*, the first question would fall within the scope of judicial inquiry and the second question would not." *Id.* at 980-81, 469 N.E.2d at 266 (quoting *Department of Public Works & Buildings v. Lewis*, 411 Ill. 242, 245-46, 103 N.E.2d 595, 597-98 (1952)).

See also *City of Chicago v. St. John's United Church of Christ*, 404 Ill. App. 3d 505, 516, 935 N.E.2d 1158, 1170 (2010) ("A court's inquiry into the existence of necessity in an eminent domain case is limited but crucial." (Internal quotations marks omitted.)).

¶ 166    Based on the aforementioned discussion of the proper scope of a traverse hearing, the trial court on remand should consider only two matters, which are landowners' claims challenging (1) the rebuttable presumptions of public use and public necessity and (2) the Commission's determination as to good-faith, as generally set forth in paragraphs 2 through 6 of landowners' July 2014 traverse motion.

¶ 167                    2. *Discovery and Proceedings on Remand*

¶ 168    In *City of Chicago*, a church challenged the condemnation of its cemetery for the city's O'Hare airport expansion plans. *Id.* at 507, 935 N.E.2d at 1163. On appeal, the appellate court considered the church's argument "that the trial court erred [by] denying their motion to compel discovery of additional documents regarding the issues of necessity and discretion." *Id.* at 516, 935 N.E.2d at 1170. The court based its denial of the motion to compel on its review of " 'all of the documents, plans, and public records previously produced by the City in this matter,' " and it determined that the church had " 'everything *** on the issue of necessity the City is required to produce.' " *Id.* at 517, 935 N.E.2d at 1170. The court also determined that the specific discovery the church sought regarding (1) the possibility of alternate plans for the property and (2) the city's availability to pay for such an expansion were not proper areas of judicial inquiry. *Id.* at 517, 935 N.E.2d at 1170-71. The appellate court affirmed the trial court's judgment, concluding that no abuse of discretion had occurred. *Id.* at 517, 935 N.E.2d at 1171.

¶ 169    We note that in their brief to this court, landowners rely on *dicta* in *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 333 Ill. App. 3d 821, 833, 777 N.E.2d 369, 379 (2002), *rev'd on other grounds*, 209 Ill. 2d 471, 810 N.E.2d 1 (2004), for the proposition that a traverse hearing "resembles a trial more than it does a conventional motion hearing." From that premise, landowners contend that they require discovery to properly prepare, which they claim includes deposing Brorsen, IEPC's valuation expert. We disagree with the notion that a traverse hearing resembles a trial. As this case and *City of Chicago* clearly illustrate, a traverse hearing is akin to a hybrid proceeding in which specific presumptions must be rebutted by landowners challenging the condemnation filing at issue.

¶ 170    Another difference exists between a typical trial and a traverse hearing. In preparation for a typical trial, discovery "includes not only what is admissible at trial, but also that which leads to admissible evidence." *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001, ¶ 76, 992 N.E.2d 103. Given the limited purpose of a traverse hearing, such broad discovery is a wasteful use of resources that would serve only to complicate, confuse, and delay the proceedings (as this case clearly shows).

¶ 171    Consistent with the limited nature of a traverse motion, as well as our limited remand, we direct the trial court to assume control of the discovery proceedings in the instant case by requiring any discovery request to set forth with specificity (1) the information the party seeks, (2) the alleged source of that information, and (3) the relevance of the information sought, given the limited remand in this case. The aforementioned listing, however, does not preclude the court from imposing further discovery requirements.

¶ 172    Consistent with *City of Chicago*, the trial court should determine whether any discovery sought is appropriate and should deny any request to depose or submit interrogatories which seeks information the court deems irrelevant or that already exists in the record or is already in the possession of the party making the discovery request. If the court determines that discovery—strictly limited to the aforementioned issues—is warranted, it shall actively supervise to ensure discovery occurs in an efficient and expeditious manner.

¶ 173    Given the extensive litigation that has already occurred in this matter and our explicit direction that the trial court conduct an expedited traverse hearing limited to the claims at issue, the court should inquire whether any information sought by landowners through discovery already exists in the record in this matter. For instance, in *Intervenors II*, in which this court affirmed the Commission's grant of eminent domain authority to IEPC, John McKay, IEPC's manager of land services, provided detailed testimony about the procedures IEPC employed to identify, contact, educate, and negotiate good-faith offers IEPC extended to recalcitrant landowners. See *Intervenors II*, 2015 IL App (4th) 140592-U, ¶¶ 23-26 (summarizing McKay's testimony before the ALJ). Landowners, who participated in these proceedings, were permitted to cross-examine McKay. Thus, any claim by landowners that they need to depose McKay to refute that IEPC's condemnation suit was filed after good-faith efforts to negotiate had failed should be met with skepticism by the trial court. That court should permit IEPC to challenge landowners' additional requests for discovery by demonstrating that the information sought is either irrelevant to the traverse proceedings or cumulative because the additional discovery sought already appears in the record or is in the possession of landowners or their counsel.

¶ 174    On remand, the trial court should conduct a two-stage traverse hearing. At the first stage, the court should focus solely on whether landowners can present (1) clear and convincing evidence to rebut the presumptions of public use and public necessity and (2) sufficient evidence to refute the substantial deference afforded the Commission's good-faith determination. If the court determines that landowners have done so, then the court should proceed to the second stage, which would contemplate a further hearing where the parties could present evidence in support of their respective positions. We direct the trial court to schedule and otherwise supervise discovery and conduct further proceedings regarding a traverse hearing in an expedited fashion. If, in the court's judgment, landowners fail to (1) rebut the presumptions of public use and public necessity in IEPC's favor or (2) successfully refute the Commission's good-faith determination, the court should so rule as to those specific issues, deny landowners' traverse motion, certify the record, and return the matter back to this court. If landowners present sufficient evidence to rebut the presumptions or to refute the good-faith determination, the court should then conduct a further hearing as to those claims on the traverse motion. If the court finds in favor of one or more landowners, then it should enter an order denying IEPC's condemnation motion as to that landowner or those landowners. Conversely, if the court rules in IEPC's favor following the traverse hearing, it should enter an

order to that effect. Regardless of the decision rendered, if a traverse hearing is conducted, the court should again certify the record in this matter to this court so that we may then resolve this appeal.

¶ 175    If the trial court finds that landowners have overcome the first-stage hurdle, then further second-stage proceedings regarding the traverse hearing shall be tried by the court instead of a jury. In this regard, we note that section 10-5-5 of the Act, which is titled, "Compensation; jury," states that "[w]hen compensation is so made by the condemning authority, any party, upon application, may have a trial by jury to ascertain the just compensation to be paid." 735 ILCS 30/10-5-5 (West 2014). No such provision entitling landowners to a jury determination in a traverse hearing appears in section 5-5-5 of the Act, which governs traverse hearings and appears immediately preceding section 10-5-5 of the Act. See *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1056, 827 N.E.2d 949, 957 (2005) (tenet of statutory construction provides that if one section of a statute contains a specific provision, the absence of that same provision from a similar section is significant to show a different legislative intent for the statutory sections at issue). Further, our research had disclosed no case in which the issues presented in a traverse motion were resolved by a jury.

¶ 176                              3. *The Timeline on Remand*

¶ 177    We note that in other contexts, the appellate court has remanded a cause to conduct an expedited hearing on a limited issue and imposed specific directions regarding when the trial court was expected to accomplish the appellate court's direction. For example, in *People v. Bohanan*, 243 Ill. App. 3d 348, 612 N.E.2d 45 (1993), this court remanded the matter to the trial court for the limited purpose of conducting an expedited hearing in accordance with *Batson v. Kentucky*, 476 U.S. 79 (1986). In so doing, the appellate court provided the following directions on remand:

> "Upon completion of the preceding steps, the trial court must make both credibility and factual determinations based on the proffered evidence. These findings, including the record, shall be filed with the clerk of this court within 60 days of the filing of this opinion. This court retains jurisdiction for the purpose of reviewing the trial court's determinations pursuant to *Batson*. Both defendant and the State will be permitted to submit supplemental briefs relative to this issue in this court." *Bohanan*, 243 Ill. App. 3d at 352, 612 N.E.2d at 48.

See also *People v. Fellers*, 2016 IL App (4th) 140486, ¶ 36 (while retaining jurisdiction over the case, the appellate court remanded to the trial court for the limited purpose of conducting an appropriate hearing on the defendant's ineffective-assistance-of-counsel claim); *Fleming v. Moswin*, 2012 IL App (1st) 103475-U, ¶¶ 45-46 (while retaining jurisdiction over the case, the appellate court remanded to the trial court for the limited purpose of conducting a *Batson* hearing within 60 days and requiring the parties to file responses within 14 days of trial court's ruling on remand).

¶ 178    Unlike *Bohanan*, we prefer to forego mandating that the trial court conduct the traverse hearing within a specific time frame. Instead, we leave these timing issues to the trial court's discretion. However, given this court's direction that the trial court should conduct an expedited hearing limited to landowners' traverse motion, we expect that the trial court will do so at the earliest possible opportunity.

¶ 179  Because we have concluded that the trial court failed to conduct a proper traverse hearing, we vacate the court's traverse order and remand this cause for the limited purpose of conducting an *expedited* traverse hearing in compliance with this court's aforementioned directions. In so ordering, this court retains jurisdiction to review the trial court's ruling following remand. See *People v. Garrett*, 139 Ill. 2d 189, 195, 564 N.E.2d 784, 787 (1990) ("The appellate court is empowered under Rule 615(b) to remand a cause for a hearing on a particular matter while retaining jurisdiction.").

¶ 180  Within 21 days following the trial court's certification of the record to this court, any party who is aggrieved by the trial court's rulings on remand may submit to this court a supplemental brief addressing solely any issues related to those rulings. Thereafter, the opposing party or parties shall have 21 days to file any response. This court will not grant any request for an extension of time to file supplemental briefs. Arguments on issues not directly related to the traverse hearing on remand may not be raised without this court's permission. In due course, this court will issue its decision on all issues raised in this appeal.

¶ 181                                    III. CONCLUSION

¶ 182  For the foregoing reasons, we vacate the trial court's traverse judgment and remand with directions for further proceedings consistent with the views expressed herein.

¶ 183  Vacated; cause remanded with directions.